JAMES B. CRABTREE *et al.*, Plaintiffs-Appellants, v. THE DEPART-
MENT OF AGRICULTURE *et al.*, Defendants-Appellees.

Fourth District   No. 4—86—0900

Opinion filed May 26, 1988.—Rehearing denied June 29, 1988.

GREEN, P.J., dissenting.

Evan H. Johnson and Frederic L. Kenney, both of Armstrong, Winters, Prince, Featherstun & Johnson, of Decatur, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, of Chicago, and Frank A. Hess and Raymond J. Watson, Jr., Assistant Attorneys General, of Springfield, of counsel), for appellees.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiffs James B. Crabtree and Douglas Crabtree appeal from a Macoupin County circuit court order which upheld an administrative finding by the Director of Agriculture that they were not entitled to recovery from the Illinois Grain Insurance Fund (fund). The Atwater Grain Company failed, and the Crabtrees filed claims based on two warehouse receipts. A hearing officer and the Director of Agriculture (Director) essentially found the warehouse receipts issued by Atwater to the Crabtrees were improper and did not permit them to recover pursuant to the Illinois Grain Insurance Act (Grain Insurance Act) (Ill. Rev. Stat. 1983, ch. 114, pars. 701 through 712). The circuit court determined the Director's decision was not against the manifest weight of the evidence. We affirm.

Before addressing the merits of the appeal we consider plaintiffs' motion to strike portions of the State's brief.

■■ The Crabtrees have moved to strike those portions of the State's brief which refer to facts not in evidence at the administrative hearing, and to an argument which the Crabtrees claim was not before the administrative agency. (107 Ill. 2d R. 361.) The State has not responded to this motion. The State's failure to respond does not concede the motion.

Section 3—110 of the Code of Civil Procedure (Code) provides for review of an administrative action in the following terms:

"The hearing and determination shall extend to all questions of law and of fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1983, ch. 110, par. 3—110.)

Further discussing the role of the circuit court in reviewing an administrative decision, the Code provides the circuit court will have the power:

"[T]o remand for the purpose of taking additional evidence when from the state of the record of the administrative agency or otherwise it shall appear that such action is just. However, no remandment shall be made on the ground of newly discovered evidence unless it appears to the satisfaction of the court that such evidence has in fact been discovered subsequent to the termination of the proceedings before the administrative agency and that it could not by the exercise of reasonable diligence

have been obtained at such proceedings; and that such evidence is material to the issues and is not cumulative." (Ill. Rev. Stat. 1983, ch. 110, par. 3—111(7).)

On appeal, this court has the power to "order or permit the record to be amended by correcting errors or by adding matters that should have been included." 107 Ill. 2d R. 366(a)(3).

■ On appeal, the State concedes the reverse side of the Douglas Crabtree receipt was not in the administrative record. The State then suggests the records indicating Atwater Grain had no company-owned grain at the time of the receipts in question should be admitted as evidence discovered subsequent to the hearing. Implicit in this argument is the admission these records were not in the administrative record. Under section 3—110 of the Code, the circuit court is specifically confined to the administrative record in reviewing the agency's decision.

Although section 3—111 of the Code (Ill. Rev. Stat. 1983, ch. 110, par. 3—111) permits the court to remand a case on the ground of newly discovered evidence, the court must first determine this evidence had not been discovered prior to the administrative proceedings, and "that it could not by the exercise of reasonable diligence have been obtained at such proceedings." It is impossible for any party to be unaware of the reverse side of the Douglas Crabtree warehouse receipt if, as appears, the original was available for photocopying. Similarly, the Atwater Grain Company records, which suggest the company had no "house" grain, must have been available at all times during this proceeding unless actively concealed by some participant. Nothing in the record suggests any party has concealed these records. Assuming this evidence was not available prior to the administrative hearing, nothing suggests it could not have been obtained with the exercise of reasonable diligence by the State. The Crabtrees' motion to strike references to the reverse side of the Douglas Crabtree receipt and to the records concerning Atwater's ownership of grain is granted.

■ The Crabtrees also claim in their motion to strike the State cannot raise the question of "due negotiation" because it has not brought a cross-appeal from the circuit court's ruling that the negotiation defense was not properly before that court. The administrative hearing record indicates the proceeding before the hearing officer was an extended affair, during which counsel did not generally make specific arguments concerning claims to the hearing officer. Rather, testimony would be presented concerning a specific claim, and the hearing officer would make a ruling as to the claim's proper classification. The hearing officer would state the basis for his ruling, but this does not appear to have been in direct response to arguments by counsel. Ap-

parently, the issue of "due negotiation" was never raised by the parties, or alluded to by the hearing officer at the original hearing. In their petition for reconsideration filed with the Department of Agriculture, however, the Crabtrees argue the receipts in question were duly negotiated as required by the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1983, ch. 26, par. 1—101 *et seq.*). The issue of "due negotiation" was not explicitly considered in denying the petition for reconsideration.

In the circuit court, the State raised the issue in support of the agency's decision, and the Crabtrees responded with a motion to strike that portion of the State's argument. The circuit court refused to consider the State's argument concerning "due negotiation" on the ground the argument "was not raised at the administrative hearing." The State has not filed a cross-appeal in this case.

Although the State has not filed a response to the Crabtrees' motion to strike in this court, the State's brief seeks to justify this court's consideration of the "due negotiation" argument. The State relies on the general principle that an appellee may defend a judgment on review by raising any issue for which a factual basis appears in the record, citing *Peters & Fulk Realtors, Inc. v. Shah* (1986), 140 Ill. App. 3d 301, 488 N.E.2d 635. The full and proper statement of the rule appears to be that "an appellee may defend a judgment on review by raising an issue *not previously ruled upon by the trial court* if the necessary factual basis for the determination of the issue is contained in the record. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417; *Shaw v. Lorenz* (1969), 42 Ill. 2d 246, 246 N.E.2d 285; *La Salle National Bank v. Grayslake* (1963), 29 Ill. 2d 489, 194 N.E.2d 250.)" (Emphasis added.) *Roots v. Uppole* (1980), 81 Ill. App. 3d 68, 73, 400 N.E.2d 1003, 1006.

In general, a reviewing court should not consider complaints raised by an appellee concerning action taken by the circuit court unless the appellee has filed a cross-appeal from the court's decision. (*Abdul-Karim v. First Federal Savings & Loan Association* (1984), 101 Ill. 2d 400, 462 N.E.2d 488.) In interpreting this rule, however, courts look to the relief sought by an appellee in the trial court in determining whether a trial court decision was adverse in any respect. (*People v. Bradford* (1939), 372 Ill. 63, 22 N.E.2d 691; *State Farm Mutual Automobile Insurance Co. v. Stuckey* (1983), 112 Ill. App. 3d 647, 445 N.E.2d 791.) In *Bradford*, even though a trial court had stricken 8 of 12 defenses raised by a defendant, but had held in defendant's favor, defendant was permitted to argue each of the stricken defenses on appeal as bases for upholding the trial court decision. Similarly, in

*Stuckey,* an arbitrator's decision in favor of a respondent was upheld by the circuit court following a ruling by the court that the arbitrator's decision was reviewable. The respondent was not required to cross-appeal in order to assert "non-reviewability" as a basis for upholding the arbitrator's decision at the appellate court.

■ The procedures in this case are different from those in either *Bradford* or *Stuckey.* "Due negotiation" was not made an issue by the State in the agency hearing. The Crabtrees had no reason to provide evidence relating to the issue. To now allow the State to present the defense would, for practical purposes, deprive the Crabtrees from participating in the evidentiary process. Because there was an insufficient evidentiary process relating to "due negotiation," there is not an adequate factual basis in the record to justify considering the subject on appeal, and we will not.

On January 4, 1985, Atwater Grain Company negotiable grain warehouse receipt A, No. A40, was issued to James B. Crabtree for 50,000 bushels of No. 2 corn. The receipt shows "Received for the account of James B. Crabtree." No storage charges are listed, and no other owner than James B. Crabtree is listed. James Crabtree testified the receipt represented 50,000 bushels of corn he purchased from Atwater Grain for $140,000. Receipt No. A41 was dated January 7, 1985, for 25,000 bushels of No. 2 corn and was otherwise identical to No. A40 except it provided: "Received for account of Doug Crabtree (Collateral Receipt)." Douglas Crabtree testified he had received receipt No. A41 as collateral for a loan of $100,000. It is not questioned the $140,000 and the $100,000 were paid to Atwater Grain, but whether James B. Crabtree's payment was a loan or purchase of grain was an issue before the hearing officer.

■ The Director of Agriculture, acting pursuant to the requirement of section 9(a) of the Grain Insurance Act (Ill. Rev. Stat. 1983, ch. 114, par. 709(a)) by the hearing officer, heard evidence and basically made two determinations, both adopted by the Director. He found James B. Crabtree's transaction was not a purchase of corn but was a loan of $140,000. This finding is not to be disturbed unless it is against the manifest weight of the evidence. (*Kellogg Switchboard & Supply Corp. v. Department of Revenue* (1958), 14 Ill. 2d 434, 439, 153 N.E.2d 45, 48.) James Crabtree's so-called purchase was evidenced by a check dated the day after the date of issuance of receipt No. A40. Receipt No. A40 failed to provide for storage rates. Within a few days, James' brother, Douglas, advanced funds specifically treated as a loan. Both James and Douglas knew of Atwater's financial difficulty. When asked why he wished to purchase 50,000 bushels of corn, James stated:

"The Witness: I've lived there 60 years and it was a very good thing for the community, and at the time they [Atwater] were having trouble getting grain delivered and I said I'll buy the grain if you need the money for operating expenses. That's the sole reason for it. I wanted to see the elevator stay there.

Mr. Narmont: Q. You did advance the money for operating expenses?

Answer: I did not. I bought grain."

The finding of the hearing officer was not against the manifest weight of the evidence.

The Director next held the warehouse receipts were not proper because they were issued directly to a lender, and did not list the warehouse as owner. This resulted in a holding the Crabtrees could not recover under the Grain Insurance Act.

The Grain Insurance Act was created to improve the economic stability of agriculture by creating a fund to provide compensation to grain producers and claimants "for losses occasioned by the failure of a grain dealer or grain warehouseman." Ill. Rev. Stat. 1983, ch. 114, par. 701(b).

■ "Claimant" includes "a lender, possessing warehouse receipts covering grain owned or stored by the grain dealer or warehouseman." (Ill. Rev. Stat. 1983, ch. 114, par. 702.) If the Crabtrees are lenders, and possess valid warehouse receipts, then they are entitled to the benefits of the Grain Insurance Act.

The Department of Agriculture points out the last paragraph of section 2 of the Grain Insurance Act (Ill. Rev. Stat. 1983, ch. 114, par. 702) incorporates the terms of the UCC. Section 7—202(2)(h) of the UCC (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(2)(h)) requires the warehouse receipt if "issued for goods of which the warehouseman is owner" to embody the ownership within the terms of the receipt. It is contended that the absence of such notation on receipt Nos. A40 and A41 results in illegality.

The Crabtrees set forth that both receipts state:

"The undersigned warehouseman may store grain for himself, may issue warehouse receipts for grain of which he is the owner, either solely or jointly with others, and may commingle grain of which he is owner with grain of others."

In addition, Douglas Crabtree's receipt states it is a "Collateral Receipt." The argument is also made that section 7—202(1) of the UCC (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(1)) announces, as a general rule, that a warehouse receipt need not be in any particular form and section 7—202 does not provide for invalidation because a warehouse

receipt fails to contain one or more of the required terms.

■■ Initially, we hold that as to the terms of the warehouse receipts, section 17.01 of the Public Grain Warehouse and Warehouse Receipts Act (Public Grain Act) (Ill. Rev. Stat. 1983, ch. 114, par. 214.17) controls over section 7—202(1) of the UCC. Section 17.01 limits grain warehouse receipts to those approved by the Department of Agriculture. Specific provisions as to issuance and recording warehouse transactions are set forth in various sections of the Public Grain Warehouse and Warehouse Receipts Act (Public Grain Act) (Ill. Rev. Stat. 1983, ch. 114, pars. 214.1 through 214.29).

Section 7a of the Public Grain Act (Ill. Rev. Stat. 1983, ch. 114, par. 214.7a) states:

"A licensed Class 1 warehouseman may issue a warehouse receipt for grain owned by himself, and dispose of the title to or interest in such grain through the medium of such receipt. No warehouse receipt so issued by any Class 1 warehouseman shall be invalid and no negotiation, transfer or pledge of any such receipt shall be defeated by reason of the fact that the grain covered by the receipt was owned, in whole or in part, by the warehouseman at the time the receipt was issued. Such warehouseman, at the time of such disposition of title to or interest in such grain as described in such receipt shall be deemed to have the custody of such grain in the interest of the person acquiring such title or interest, and to be the warehouseman for such grain to the same degree and with the same responsibility as though the receipt had been issued against grain owned by the person acquiring such title or interest. The rights of such person acquired through such receipt shall be of the same effect as though such person had made the deposit from owned grain or as the owner of a preferred interest in such grain."

It would appear that the ultimate question is whether, for purposes of coverage under the Grain Insurance Act, a section 7a transfer by warehouse receipt is invalid if there is a failure to comply with section 7—202(2)(h) of the UCC. Neither of the Crabtrees' warehouse receipts stated that the receipts were issued "for goods of which the warehouseman is owner."

The authorities cited by both sides are of little value in deciding the issue. Both *Maryland Casualty Co. v. Washington Loan & Banking Co.* (1928), 167 Ga. 354, 356, 145 S.E. 761, 762 (which indicated the warehouse receipt should first be issued to the warehouseman), and *Central National Bank v. Fidelity & Deposit Co.* (7th Cir. 1963), 324 F.2d 830 (which held the warehouse receipts were illegal because

they failed to state that the grain was the warehouseman's and was stored in a separate bin) preceded the State of Illinois Constitution of 1970.

The State of Illinois Constitution of 1870 (Ill. Const. 1870, art. XIII), illustrating the then agrarian nature of the State's economy, contained article XIII, which was solely addressed to warehouses. The warehouse provisions were interpreted as prohibiting a grain warehouseman from commingling his grain with that of those storing grain. (*Hannah v. People ex rel. Attorney General* (1902), 198 Ill. 77, 90, 64 N.E. 776, 779.) The warehouse provisions were deleted from the Constitution of 1970.

■ The provisions of section 7—202(2)(h) of the UCC (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(2)(h)) requiring a warehouse receipt used to transfer warehoused property belonging to the warehouse to set forth such ownership are not in conflict with section 17.01 of the Public Grain Act (Ill. Rev. Stat. 1983, ch. 114, par. 214.17). Also, section 7a of the Public Grain Act (Ill. Rev. Stat. 1983, ch. 114, par. 214.7a) is consistent with section 7—202(2)(h) of the UCC.

Reading the various constitutional and statutory provisions relating to grain warehousing, together with the cases already cited in this opinion, the past problems with grain warehouse insolvencies become apparent. Few lawyers practicing in agricultural areas of this State have escaped problems dealing with insolvent grain elevators. These problems obviously preceded the Constitution of 1870. Warehouse receipt records became a tool in the State's effort to protect those storing grain. The requirement of specific forms, with consecutively numbered receipts, was to assist auditors in checking the amount stored against the amounts listed on issued receipts. Hopefully, there could be early discovery of misappropriation. Regardless of these provisions, grain elevators continued to fail, bringing grief to lenders and to those storing grain they produced.

The continued losses to those storing produced grain and to those financing grain elevators resulted in the Grain Insurance Act. By examining that act, it is apparent no changes were intended to be made to the sections of either the UCC or the Public Grain Act.

■ Prior to the Grain Insurance Act, the amount of the warehouse bond often limited recovery. Under the Grain Insurance Act, except for the limitations of section 8 (Ill. Rev. Stat. 1983, ch. 114, par. 708), recovery for the qualified claimants seems to come from a bottomless pit. (See Ill. Rev. Stat. 1983, ch. 114, par. 707.) The claimants have one thing in common—evidence of stored grain or warehouse receipts. The Grain Insurance Act clearly is not intended to insure gen-

eral creditors. It necessarily follows that it is not intended to cover creditors who receive interests in warehouse receipts knowing they were issued for nonexistent grain.

As previously set forth, we refuse to consider the State's late contentions referring to the Crabtrees' possible knowledge of the nonexistent grain. However, we do understand the need, if for nothing more than protecting the insurance funds, for specific compliance with statutory provisions regulating warehouse receipts.

We conclude those who are going to lend to grain warehousemen should be required to comply with the UCC and Public Grain Act provisions. They may not avoid the consequences of invalid receipts by allegations the borrowers prepared the warehouse receipt documents. Enacted specific controls on warehouse receipts, presumably based on public policy, should not be subject to indiscriminate judicial tampering.

■ The receipts of both James B. Crabtree and Douglas Crabtree are not in compliance with section 7—202(2)(h) of the UCC and with section 7a of the Public Grain Act and are illegal. Recovery from the fund was properly denied.

Affirmed.

LUND, J., concurs.

PRESIDING JUSTICE GREEN, dissenting:
I dissent. I would reverse the judgment of the circuit court affirming the decision of the Director of Agriculture (Director) and remand to the Director with directions to allow the claims of both plaintiffs. I agree with most of the analysis by the majority, including their determination that the Director's finding plaintiffs were lenders was not contrary to the manifest weight of the evidence. The reason for my dissent is that I do not interpret section 7—202(1) of the UCC (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(1)) to provide such receipts are invalid if the name of the owner of the grain does not appear thereon.

Section 7—202 states:

"Form of Warehouse Receipt; Essential Terms; Optional Terms. (1) A warehouse receipt need not be in any particular form.

(2) Unless a warehouse receipt embodies within its written or printed terms each of the following, the warehouseman is *liable for* damages caused by the omission to a person injured thereby:

\* \* \*

(h) if the receipt is issued for goods of which the warehouse-

man is owner, either solely or jointly or in common with others, the fact of such ownership ***." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 26, par. 7—202.

As the majority points out, section 7—202 does not provide that receipts failing to conform to its requirement are invalid. Rather, section 7—202 places responsibility for those imperfections on the issuer. Section 7—401(a) of the UCC states that the "obligations imposed by [Article 7] on an issuer apply to a document of title regardless of the fact that" the document does not "comply with the requirements of [Article 7]" (Ill. Rev. Stat. 1983, ch. 26, par. 7—401(a)). When sections 7—202 and 7—401(a) are considered together, a clear indication is given that under the UCC, a warehouse receipt given by a warehouseman for grain he purportedly owns and has in storage is not made invalid by the failure of the warehouseman to record his ownership of the grain on the receipt.

The majority does not contend any part of the Public Grain Act (Ill. Rev. Stat. 1983, ch. 114, pars. 214.1 through 214.29) invalidates warehouse receipts for grain issued by a warehouseman for grain purportedly owned by him merely because the receipts do not designate the ownership of the grain on their face. I find no such provision in the Public Grain Act. Accordingly, I conclude that here, where the State failed to prove either plaintiffs knew of the lack of grain on hand to cover their receipts or that either plaintiff was guilty of any fraud or collusion with any agent of Atwater Grain Company, plaintiffs had valid receipts against the grain held by Atwater Grain Company.

Plaintiffs were "claimants" within the meaning of section 2 of the Grain Insurance Act because they were "lenders" possessing "warehouse receipts covering grain owned *** by the *** warehouseman," and had not been repaid their loans in full prior to the failure of Atwater Grain Company. Ill. Rev. Stat. 1983, ch. 114, par. 702.

I share the majority's concern that the Grain Insurance Act may be abused. While clearly the Grain Insurance Act was not intended to cover creditors who receive interest in warehouse receipts knowing the receipts were issued for nonexistent grain, no such finding was made by the Director and the record does not indicate that issue to have been raised. Any evidence of the existence of such knowledge by plaintiffs was very circumstantial. Under the evidence presented and issues raised, plaintiffs' claims should have been allowed.