(No. 67396.—

JAMES B. CRABTREE *et al.*, Appellants, v. THE IL-
LINOIS DEPARTMENT OF AGRICULTURE, Divi-
sion of Agricultural Industry Regulation, Bureau of
Warehouses, *et al.*, Appellees.

*Opinion filed May 24, 1989.*

Evan H. Johnson and Frederic L. Kenney, of Armstrong, Winters, Prince, Featherstun & Johnson, of Decatur, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Rosalyn B. Kaplan, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE CALVO delivered the opinion of the court:

Plaintiffs, James B. Crabtree and Douglas Crabtree, filed a complaint for administrative review in the circuit court of Macoupin County after the Director of Agriculture found they were not entitled to recovery on claims filed pursuant to the Illinois Grain Insurance Act (Ill. Rev. Stat. 1983, ch. 114, par. 701 *et seq.*). The circuit court upheld the Director's decision, and the appellate court affirmed the judgment of the circuit court (170 Ill. App. 3d 387). We granted the plaintiffs' petition for leave to appeal under Supreme Court Rule 315 (107 Ill. 2d R. 315).

The claims filed by the Crabtrees arose from the economic failure of the Atwater Grain Company (Atwater) and were based on two warehouse receipts. The receipt submitted by James Crabtree was issued by Atwater on January 4, 1985, for 50,000 bushels of corn. The face of the receipt states: "Received for account of James B. Crabtree." No storage charges were listed. James Crabtree testified that the receipt represented 50,000 bushels of corn he purchased from Atwater for $140,000. The receipt submitted by Douglas Crabtree was issued by Atwater on January 7, 1985, for 25,000 bushels of corn. It recites: "Received for account of Douglas Crabtree (Collateral Receipt)." Douglas Crabtree testified he had received the receipt as collateral for a loan of $100,000. Payment of the foregoing sums of money to Atwater is not in dispute.

The hearing officer denied James Crabtree's claim on the Grain Insurance Fund, holding that Crabtree had only a "general creditor claim," unrelated to a grain transaction and payable only after satisfaction of "grain claims." Officer Crews found that James Crabtree's intent was not to purchase Atwater's grain, but to "finance the elevator operation." Apparently this finding was based on Crabtree's testimony that he bought the grain to help alleviate Atwater's cash-flow problems and thereby keep Atwater in the community. Having found that the transaction was in reality a loan, Officer Crews determined that James Crabtree's warehouse receipt was not duly issued to reflect the true nature of the transaction. Officer Crews also found Douglas Crabtree's warehouse receipt "improperly issued" and relegated both James and Douglas Crabtree to the subordinate status of general creditors.

The Crabtrees filed a petition for reconsideration of the hearing officer's decision. On June 18, 1985, the Director of Agriculture affirmed the order of the hearing officer. In upholding the denial of James Crabtree's claim on the Grain Insurance Fund, the Director concurred that Crabtree's transaction with Atwater was in fact a loan, finding dispositive the fact that Crabtree was not assessed storage charges for the storage of the grain and testimony that Crabtree's motivation for purchasing the grain "was to provide money to Atwater Grain Company for operating expenses." The Director determined, "both James and Douglas Crabtree's claims arose from making loans to Atwater Grain Company and taking warehouse receipts as collateral." Although the Director acknowledged that lenders may hold warehouse receipts as collateral, he ruled that the manner of issuance "is of paramount importance." The Director's response to the Crabtrees' petition for reconsideration states in pertinent part:

"Paragraph 214.7a of the Illinois Public Grain Warehouse and Warehouse Receipts Act [Ill. Rev. Stat. 1983, ch. 114,

par. 214.1 *et seq.*] *** states that a warehouseman may issue a warehouse receipt for grain owned by himself and dispose of the title or interest in such grain through the medium of such receipt. It does not set forth the manner in which this is done, but logic dictates that a collateral receipt must reflect that the warehouseman is the owner of the grain being used as collateral. In the matter under consideration, this is not the case. The warehouse receipts issued to the Crabtrees show that the grain covered by these receipts was received for their account when, in fact, they should show Atwater Grain Co. the owner of the grain utilized as collateral. Therefore, the warehouse receipts issued to James and Douglas Crabtree are invalid and do not entitle them to treatment as claimants under the Illinois Grain Insurance Act."

The Crabtrees sought judicial review of the Director's decision in the circuit court pursuant to sections 3—103 and 3—104 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 3—103, 3—104).

In its brief in support of its administrative ruling, the Department of Agriculture interjected "evidence" not presented during the administrative hearing. The "evidence" was purportedly discovered after the hearings before Officer Crews. The Department claimed that the Crabtrees had "intimate knowledge" of Atwater's financial affairs, that they had admitted Atwater had no company-owned grain at the time the warehouse receipts were issued, and that Douglas Crabtree was not the holder of the warehouse receipt on which his claim was based, having endorsed the receipt to the Carlinville National Bank. The Department alleged that Douglas Crabtree presented only a copy of the front of the receipt as evidence. The Department appended to its brief the affidavit of a warehouse examiner who had reconstructed Atwater's daily position records for December of 1984 and January of 1985 and determined that Atwater had issued warehouse receipts for company-owned corn in excess of the supply on hand. Also appended to the Department's brief were the daily position records of Atwa-

ter, a copy of the reverse side of Douglas Crabtree's warehouse receipt showing endorsement to the Carlinville National Bank, and the affidavit of the bank's vice-president attesting that Douglas Crabtree had endorsed the receipt as security for a loan.

The Crabtrees moved to strike portions of the Department's brief wherein the Department referred to facts not of record in the administrative proceedings and requested remand for the presentation of additional evidence in the event the circuit court reversed the administrative decision. The Crabtrees argued, based on language in section 3—111(a)(7) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 3—111(a)(7)), that remand to consider additional evidence bearing on the circumstances surrounding negotiation of the warehouse receipts was unwarranted where the Department had made no showing that such evidence was "unobtainable through the exercise of reasonable diligence at the time of the original administrative hearing."

By order entered December 3, 1986, the circuit court granted the Crabtrees' motion to strike evidence not contained in the administrative record and arguments not raised during the administrative hearing. The court found, however, that the decision of the Director of Agriculture, denying the Crabtrees' petition for reconsideration, was not contrary to the manifest weight of the evidence.

The appellate court, one justice dissenting, affirmed the judgment of the circuit court. (170 Ill. App. 3d 387.) A unanimous appellate panel granted the Crabtrees' motion to strike references in the Department's brief to the reverse side of Douglas Crabtree's warehouse receipt and records concerning Atwater's ownership of grain. (170 Ill. App. 3d at 390.) The court declined to consider the Department's argument that the Crabtrees' receipts were not "duly negotiated" within the meaning of section 7—501(4) of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1983, ch. 26, par. 7—501(4)) because the

Department had not made due negotiation an issue in the agency hearing and the record therefore lacked an adequate factual basis to justify considering the subject on appeal. (170 Ill. App. 3d at 392.) Further, the panel agreed that the Director's finding, that the transactions at issue were loans, was not contrary to the manifest weight of the evidence. The panel disagreed, however, on the question of the validity of the Crabtrees' receipts.

The majority, citing section 7—202(2)(h) of the UCC (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(2)(h)) and section 17.01 of the Public Grain Warehouse and Warehouse Receipts Act (Public Grain Act) (Ill. Rev. Stat. 1983, ch. 114, par. 214.17), held the receipts invalid. (170 Ill. App. 3d at 394-96.) Section 17.01 of the Public Grain Act provides that public grain warehouses shall issue "only receipts as approved by the Department [of Agriculture] and no other form of receipt whatsoever ***." (Ill. Rev. Stat. 1983, ch. 114, par. 214.17.) Section 3(2) of the Public Grain Act, not specifically mentioned by the majority, states that the Department shall "[p]rescribe the kind and form of warehouse receipts which shall conform to the 'Uniform Commercial Code.' " (Ill. Rev. Stat. 1983, ch. 114, par. 214.3(2).) Section 7—202(2)(h) of the UCC provides:

> "(2) Unless a warehouse receipt embodies within its written or printed terms each of the following, the warehouseman is liable for damages caused by the omission to a person injured thereby:
>
> * * *
>
> (h) if the receipt is issued for goods of which the warehouseman is owner, either solely or jointly or in common with others, the fact of such ownership ***." (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(2)(h).)

The majority, requiring "specific compliance with statutory provisions," determined that the Crabtrees' receipts were invalid because they failed to embody the ownership of Atwater within the terms of the receipt. 170 Ill. App. 3d at 393, 396.

Justice Green, dissenting, placed a different interpretation on section 7—202 of the UCC. Noting that section 7—202(1) specifically states a warehouse receipt "need not be in any particular form" (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(1)), and that section 7—202(2) places responsibility for any imperfections in the receipt on the issuer (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(2)), Justice Green concluded that the receipts in question are not invalid because Atwater's name does not appear thereon. (170 Ill. App. 3d at 396-97.) In further support of his position, Justice Green observed that section 7—401(a) of the UCC provides "the 'obligations imposed by [article 7] on an issuer apply to a document of title regardless of the fact that' the document does not 'comply with the requirements of [article 7]' (Ill. Rev. Stat. 1983, ch. 26, par. 7—401(a))." (170 Ill. App. 3d at 397.) As there was no evidence of fraud in the record, and the Director made no finding that the receipts were issued for nonexistent grain, Justice Green concluded that the Crabtrees' claims should have been allowed.

Our analysis in this case begins with the appropriate scope of review. Section 3—110 of the Code of Civil Procedure (the Code) (Ill. Rev. Stat. 1985, ch. 110, par. 3—110) provides in pertinent part that "[n]o new or additional evidence in support of or opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." In reviewing an administrative decision, courts are confined to consideration of evidence submitted during the administrative hearing and may not entertain additional evidence or conduct a hearing *de novo*. (*Popoff v. Department of Labor* (1986), 144 Ill. App. 3d 575, 579.) The additional evidence that the Department attempted to introduce before the circuit court was therefore properly excluded. Moreover, the appellate court was correct in its determination that remand, absent reversal, pursuant to section 3—111(a)(7) of the Code (Ill. Rev. Stat. 1985, ch. 110, par. 3—111(a)(7)) was inappropriate because, from the

record, it appears the Department could, by the exercise of reasonable diligence, have obtained the evidence in question in time to submit it during the administrative proceedings.

On the merits, the first issue we will address is whether the Director's finding that James Crabtree's transaction with Atwater was a loan is against the manifest weight of the evidence. Pursuant to the following reasoning, we hold the Director's finding to be contrary to the manifest weight of the evidence.

Based upon Crabtree's testimony that his purchase of corn was motivated by a desire to help Atwater financially and keep it in the community, and the fact that Atwater charged Crabtree no storage charges following the transaction, the Director concluded the transaction was a loan rather than a purchase of corn, as Crabtree had testified. Crabtree explained in his testimony that no charges for storage were assessed because, under the terms of the agreement, Atwater was to deliver the grain to market at its convenience after the purchase. No other evidence was presented.

Although findings of fact by an administrative agency are considered to be *prima facie* true and correct (*Coleman v. Illinois Racing Board* (1988), 124 Ill. 2d 218, 221), a finder of fact cannot arbitrarily or capriciously reject the testimony of an unimpeached witness (*People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81) where the testimony of the witness is "neither contradicted, either by positive testimony or by circumstances, nor inherently improbable" (*Baker*, 88 Ill. 2d at 85). Notwithstanding the deference we generally accord an agency's findings of fact, those factual findings must still be based on the evidence. *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 145.

We see nothing inherently unreasonable in Atwater's failure to assess storage charges after James Crabtree's purchase, if, as Crabtree testified, the grain was intended for delivery to market forthwith; nor do we be-

lieve Crabtree's desire to help Atwater—and thereby keep it in the community—should necessarily transform a purchase into a loan.

Our review of general contract law fails to disclose "motivation" as a relevant factor in characterizing the nature of a transaction, barring some evidence of illegality or violation of public policy. The character of a transaction is determined by the "intention" of the parties, which is not synonymous with their purposes or motives. (17A C.J.S. *Contracts* §295a (1963).) People are motivated to purchase things for myriad reasons, ranging from altruism to avarice; however, the transactions are nonetheless sales, not loans. In general, a "loan" is defined as delivery by one party to another of a sum of money upon agreement, express or implied, to repay it with or without interest. (Black's Law Dictionary 844 (5th ed. 1979).) There is no evidence in this record indicating that repayment was intended. In fact, there is nothing to contradict James Crabtree's characterization of the transaction as a purchase. The Director's finding is contrary to the evidence.

We will now consider the Department's ruling denying the Crabtrees recovery from the Grain Insurance Fund because the Crabtrees' warehouse receipts did not meet the Department's standards. According to the Department, "formal standards for eligible receipts" must be imposed to prevent fraud and abuse of the guaranteed source of reimbursement provided by the Grain Insurance Act. While we share the Department's concern, we are not persuaded that the Department's exacting standards for scrutinizing warehouse receipts will prevent abuse of the system. Moreover, it does not appear that the relevant statutory provisions require the "strict construction" the Department has adopted.

The Illinois Grain Insurance Act was enacted, and the Grain Insurance Fund established,

"to protect grain producers in the event of the financial failure of a grain dealer or grain warehouseman and to

ensure the existence of an adequate fund so that grain producers and claimants may be compensated for losses occasioned by the failure of a grain dealer or warehouseman." (Ill. Rev. Stat. 1983, ch. 114, par. 701.)

The Act defines "claimant" broadly to include (1) any producer or person, including a lender, possessing warehouse receipts covering grain owned or stored by the grain dealer or warehouseman; (2) any person with written evidence of ownership, other than warehouse receipts, disclosing a storage obligation of the grain dealer or warehouseman; (3) any person who has lent money to a dealer or warehouseman and was to receive a warehouse receipt as security for that loan, but the dealer or warehouseman failed within 21 days after receiving the loan monies and no warehouse receipt was issued; (4) any person who has surrendered a warehouse receipt as part of a grain sale transaction and, because of a dealer or warehouse failure within 21 days thereafter, the person surrendering the receipt did not get paid therefor; or (5) any producer who possesses written evidence of a grain sale to a failed grain dealer or warehouseman, but was not fully paid therefor and is unable to secure satisfaction of financial obligations due pursuant to certain other statutory enactments regulating grain dealers and warehousemen. Ill. Rev. Stat. 1983, ch. 114, par. 702.

The Act guarantees claimants, who have incurred financial losses due to a failure of a grain dealer, compensation for 85% of a valid claim, to a maximum of $100,000, with monies from the Grain Insurance Fund. To the maximum extent that funds are available, the remaining balances of such claims are to be paid from the assets or other security of the failed grain dealer; however, claimants who have surrendered warehouse receipts for payment "shall" be compensated for 100% of a valid claim. (Ill. Rev. Stat. 1983, ch. 114, par. 708(a).) The Act provides that a claimant who has incurred a financial loss due to a failure of a grain warehouseman "shall" be enti-

tled to be compensated for 100% of a valid claim. Ill. Rev. Stat. 1983, ch. 114, par. 708(b).

The Act empowers the Director of Agriculture to determine valid claims and the amount of such claims (Ill. Rev. Stat. 1985, ch. 114, par. 709(a)) and defines a "valid claim" as one "arising from a failure of a grain dealer or warehouseman *** adjudicated valid by the Department *** and in accordance with Section 40.23 of The Civil Administrative Code of Illinois." (Ill. Rev. Stat. 1985, ch. 114, par. 702.) Section 40.23 of the Civil Administrative Code (Ill. Rev. Stat. 1985, ch. 127, par. 40.23) directs the Department of Agriculture to "promulgate and file procedural rules and regulations to be followed concerning *** the holding of administrative hearings to identify and verify claimants." Section 3.190(a) of title 8 of the Illinois Administrative Code provides that "[c]laims to be valid against a licensee's or registrant's assets held by the Trustee shall be defined as bona fide obligations covered by enabling statute and/or Section 40.23 of The Civil Administrative Code of Illinois ***." (8 Ill. Adm. Code §3.190(a) (1985).) Section 40.23 of the Civil Administrative Code also provides specific guidance regarding the validity of claims based on loans secured by grain as collateral. In defining "grain assets," this paragraph provides that property "shall not be deemed to be encumbered unless the encumbrance results from good and valuable consideration advanced by any secured party on a bona fide basis." (Ill. Rev. Stat. 1985, ch. 127, par. 40.23.) Identical language can be found in the definition of "grain assets" in the Grain Insurance Act. (Ill. Rev. Stat. 1985, ch. 114, par. 702.) Thus, in addition to presentation of a warehouse receipt, the underlying transaction must be "bona fide," that is, "in good faith" and "without deceit or fraud" (Black's Law Dictionary 160 (5th ed. 1979)), before a valid claim can be established.

We turn now to consider the requisites of a warehouse receipt sufficient to support a valid claim under the statute. The Grain Insurance Act's definition of "warehouse receipt" refers to the Public Grain Act "in accordance with

the Uniform Commercial Code." (Ill. Rev. Stat. 1983, ch. 114, par. 702.) The Public Grain Act, which was enacted to regulate public grain warehouses and warehouse receipts, provides that public grain warehouses licensed in Illinois shall issue "only receipts as approved by the Department and no other form whatsoever." (Ill. Rev. Stat. 1983, ch. 114, par. 214.17.) The Act further directs the Department to "[p]rescribe the kind and form of warehouse receipts which shall conform to the 'Uniform Commercial Code', Article 7." (Ill. Rev. Stat. 1983, ch. 114, par. 214.3(2).) The Crabtrees' receipts appear to be on standard forms, presumably approved by the Department.

The question, then, is whether the Crabtrees' warehouse receipts conform to the UCC, and if they do not, whether the Crabtrees should be denied recovery from the Grain Insurance Fund because of the receipts' failure to conform. As already stated in our discussion of Justice Green's dissent, the UCC requires no particular form for a warehouse receipt. (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(1).) It does, however, hold the warehouseman liable for damages where certain elements are omitted from the receipt and a person is injured thereby. (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(2).) Where a receipt is issued for goods of which the warehouseman is owner, the fact of such ownership is an element which must be included in the receipt. (Ill. Rev. Stat. 1983, ch. 26, par. 7—202(2)(h).) In addition to the liability imposed upon an issuer for failure to include an element in section 7—202 in the warehouse receipt, the UCC provides:

> "The obligations imposed by this Article on an issuer apply to a document of title regardless of the fact that
>
> (a) the document may not comply with the requirements of this Article or of any other law or regulation regarding its issue, form or content ***." (Ill. Rev. Stat. 1985, ch. 26, par. 7—401(a).)

We believe, having carefully examined the statutory provisions cited by the parties, that the Crabtrees' warehouse receipts were sufficient to evidence grain transactions in-

volving a purchase of corn, and a loan secured by corn as collateral.

All of the statutory provisions cited above relate to Atwater as the issuer of the warehouse receipts. The UCC provisions exhibit an intent to protect persons injured by the issuance of irregular warehouse receipts. The Grain Insurance Act is intended to protect grain producers and claimants who sustain losses because of grain warehouse failures. Nowhere in any of these provisions is there evidence that the legislature intended to penalize a farmer who took a warehouse receipt in good faith and incurred a financial loss due to the warehouse's failure.

We believe the Department's procedure in this case defeats the purpose for which the fund was established and itself presents a possibility for abuse. The Department's approach leaves the financial fate of farmers, who may lack legal sophistication, in the hands of the warehousemen issuing the receipts. Moreover, it is inconceivable that the Department could undertake an intelligent and informed adjudication of claims before it had even finished its examination of Atwater's records. The summary proceeding employed here, which exalted form over substance, did not begin to address what we consider to be the most important element of a "valid claim" under the Grain Insurance Act—a *bona fide* transaction, conducted in good faith—what is referred to in the UCC as "due negotiation." (Ill. Rev. Stat. 1983, ch. 26, par. 7—501(4).) Without such an inquiry, collusion between the issuer and issuee of "facially valid" warehouse receipts could deplete the Grain Insurance Fund in short order. Irregularities in warehouse receipts should indeed be subject to careful scrutiny and funds should not be released to the holders thereof until a thorough inquiry is undertaken into the circumstances of the transaction, but we believe the technical standard applied by the Department here, while it does preserve the fund, defeats the purpose of the statute.

For the reasons stated, we reverse the judgments of the circuit and appellate courts. Because we reverse the decision of the Department denying the Crabtrees' claims based upon irregularities in their warehouse receipts, and because we find the criteria applied by the Department to determine a valid claim incomplete, we remand the cause to the Department pursuant to section 3—111(a)(6) of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 3—111(a)(6) (107 Ill. 2d R. 366(a)(5)) and direct the Department to hold further hearings to determine whether the transactions in question were *bona fide*.

*Appellate court reversed;*
*circuit court reversed;*
*cause remanded with directions.*