BOARD OF EDUCATION OF THE CITY OF PEORIA, SCHOOL DISTRICT No. 150, a/k/a Peoria School District No. 150, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—91—0029

Opinion filed October 24, 1991.

LUND, P.J., specially concurring.
GREEN, J., specially concurring.

Julian E. Cannell, of Kavanagh, Scully, Sudow, White & Frederick, P.C., of Peoria, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Arlene Y. Coleman-Romeo, of Witwer, Burlage, Poltrock & Giampietro, of Chicago, for respondent Peoria Federation of Teachers.

JUSTICE STEIGMANN delivered the opinion of the court:

After the Peoria School District No. 150 (District) fired Clarice Russell, she filed a complaint with the Illinois Educational Labor Relations Board (Board). In August 1990, a hearing officer for the Board found that the District had violated section 14(a)(3) and, derivatively, section 14(a)(1) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(3), (a)(1)). (*Peoria School District 150*, 6 Pub. Employee Rep. (Ill.) par. 1120, No. 90—CA—0017—S (Illinois Educational Labor Relations Board, Hearing Officer's Recommended Decision and Order, Aug. 27, 1990) (hereinafter 6 Pub. Employee Rep. (Ill.) par. 1120 (Hearing Officer's Recommended Decision)).) The District filed exceptions to the hearing officer's recommended decision, but the Board, in December 1990, affirmed the hearing officer's findings and adopted his rationale and order. (*Peoria School District 150*, 7 Pub. Employee Rep. (Ill.) par. 1009, No. 90—CA—0017—S (Illinois Educational Labor Relations Board, Dec. 19, 1990) (hereinafter 7 Pub. Employee Rep. (Ill.) par. 1009).) The District appeals and we reverse.

## I. FACTS

The District hired Russell in August 1988 as a class "B" secretary and assigned her as the vocational education secretary reporting to associate superintendent Dennis L. Gainey. In November or December 1988, Chester W. Dugger replaced Gainey as Russell's boss.

Dugger was not satisfied with Russell's work and wrote a memo on February 24, 1989, describing her deficiencies and recommending that Russell be "removed from her present position." Maxine Wortham, executive director of personnel, and her assistant, Mary Ryon, informed Russell of Dugger's complaints at a performance review in June 1989. Dugger wrote a second memo on June 8, 1989, again recommending that the District remove Russell from her current position. Russell was not aware of this memo until after the

District fired her. On June 22, 1989, Dugger wrote a third memo, this time specifically requesting that Russell be terminated. This memo was prompted by a phone call between Dugger and Robert Senn, a computer consultant who had been working for the district. Senn complained to Dugger that Russell was uncooperative and verbally abusive toward him. In his third memo, Dugger said that Russell engaged in similar behavior with other district employees, specifically Cindy Bennett and Dale Hoffman.

Russell met with Dugger and Wortham on July 14, 1989, to discuss Russell's job performance. Russell testified that she requested union representation at this meeting, but Wortham told her that because it was a nondisciplinary meeting, union representation was not required. Russell attended the meeting despite not having a union representative present. In the weeks following this meeting, Wortham began to recommend to Russell that she consider transferring to another position within the school district. Wortham and Ryon informed Russell of other positions available within the school district, but Russell rejected all of them.

On August 4, 1989, Dugger asked Russell to meet with him and Wortham to discuss an incident between Russell and Hoffman. Russell testified that as she and Dugger walked to Wortham's office, she requested a union representative, but Dugger told her it was a nondisciplinary meeting, meaning that a union representative would not be necessary. At Wortham's office, Dugger, Wortham, and Russell all sat at a small table. Dugger informed Russell that things were not working out. At that point, Russell immediately responded in an abrupt and defensive manner, charging that Dugger was out to fire her. Wortham suggested to Russell that she listen to what Dugger had to say. Dugger told Russell that he had decided to replace her, at which point Russell accused Dugger of not liking her, of liking another office employee better, and asserted that Dugger just did not want Russell to have this job. Russell's voice became quite loud and she expressed her wish to have a union representative with her during the meeting if they were going to fire her. She then left the office. Dugger subsequently testified that it was his intention only to remove Russell from her position as vocational education secretary.

Approximately five minutes later, Russell returned to Wortham's office with the union representative, but Dugger had already returned to his office. Later that afternoon, Dugger consulted with either Wortham or Ryon and then informed Russell in writing that she was fired "due to your insubordinate behavior at the time Dr.

Wortham and I tried to talk with you at approximately 2:15 p.m. today; this is symptomatic of your attitude not only with myself, but with others with whom you have had contact with [*sic*] throughout the year." Although Dugger did not have authority to fire Russell, Wortham did formally fire Russell from the District on Monday, August 7, 1989, when Russell reported back to work. Wortham testified that the cause of Russell's termination was her "insubordinate behavior and inability to work with others after being warned."

## II. THE COMPLAINT

The relevant portions of section 14 of the Act are as follows:

> "(a) Educational employers, their agents or representatives are prohibited from:
>
> (1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.
> &ast;&ast;&ast;
> (3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization.
> &ast;&ast;&ast;
> (5) Refusing to bargain collectively in good faith with an employee representative which is the exclusive representative of employees in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative &ast;&ast;&ast;." Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(1), (a)(3), (a)(5).

Russell's complaint asserted the following three violations of the Act: (1) the District violated sections 14(a)(1) and (a)(3) by denying Russell union representation at the disciplinary meeting; (2) the District violated section 14(a)(3) by terminating Russell because of her refusal to attend the meeting without union representation; and (3) the District refused to bargain collectively and in good faith, violating section 14(a)(5) and, derivatively, section 14(a)(1), by denying Russell union representation at the meeting.

The hearing officer made two specific findings. First, he found that the District did not violate either sections 14(a)(1) or (a)(5) by denying Russell union representation at the meeting on August 4, 1989, because the investigatory interview, in fact, never took place. In reaching this conclusion, the hearing officer noted that Russell left Wortham's office before the meeting could begin and Wortham and Dugger then discontinued the meeting. Second, the hearing of-

ficer found that the District's decision to terminate Russell "on the basis of her conduct during the meeting" violated section 14(a)(3) and, derivatively, section 14(a)(1). (6 Pub. Employee Rep. (Ill.) par. 1120, at IX—441 (Hearing Officer's Recommended Decision).) The Board adopted the hearing officer's findings. 7 Pub. Employee Rep. (Ill.) par. 1009.

### III. ANALYSIS

Courts of review will not disturb administrative findings and conclusions on questions of fact unless they are contrary to the manifest weight of the evidence. (*Garland v. Department of Labor* (1984), 104 Ill. 2d 383, 392, 472 N.E.2d 434, 437; *Hardin County Education Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 178, 528 N.E.2d 737, 743.) A finding is against the manifest weight of the evidence only if an opposite conclusion is "clearly evident." (*Burnham City Hospital v. Human Rights Comm'n* (1984), 126 Ill. App. 3d 999, 1003, 467 N.E.2d 635, 637; see also *Lyles v. Department of Transportation* (1989), 183 Ill. App. 3d 901, 908, 539 N.E.2d 833, 837.) In other words, rejecting a finding is possible only if the reviewing court can say that all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that it is erroneous. (*Tinner v. Police Board* (1978), 62 Ill. App. 3d 204, 208, 378 N.E.2d 1166, 1169; *Daniels v. Police Board* (1976), 37 Ill. App. 3d 1018, 1023, 349 N.E.2d 504, 508.) While findings and conclusions of an administrative agency on questions of fact are considered *prima facie* true and correct (Ill. Rev. Stat. 1989, ch. 110, par. 3—110; *Hardin*, 174 Ill. App. 3d at 178, 528 N.E.2d at 743), those factual findings must still be based on evidence presented. (*Crabtree v. Illinois Department of Agriculture* (1989), 128 Ill. 2d 510, 518, 539 N.E.2d 1252, 1257.) After considering this record in light of the foregoing authority, we conclude that the Board's decision is contrary to the manifest weight of the evidence.

In order to establish a *prima facie* case of discriminatory discharge under section 14(a)(3) of the Act, a complainant must show (1) the employee engaged in an activity protected under section 14(a)(3) of the Act; (2) the District was aware of that protected activity; and (3) the employee was discharged for engaging in that activity. (See *Hardin*, 174 Ill. App. 3d at 178-79, 528 N.E.2d at 743.) "Once the complainant has made this showing, the burden shifts to the employer to demonstrate by a preponderance of the

evidence that the same action would have taken place even in the absence of the protected activity." *Hardin,* 174 Ill. App. 3d at 179, 528 N.E.2d at 743; see also *NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 400, 76 L. Ed. 2d 667, 674, 103 S. Ct. 2469, 2473 (characterizing the burden shifting as an affirmative defense for the employer).

## A. *The Conclusion That Complainant Established a Prima Facie Case*

■■ The hearing officer concluded there could be "no dispute" that the complainant had satisfied the first and second elements of the *prima facie* case. (6 Pub. Employee Rep. (Ill.) par. 1120, at IX—441 (Hearing Officer's Recommended Decision).) In addressing the third element, the hearing officer cited to *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 538 N.E.2d 1146. We, too, quote from that case as follows:

> "Where an employer is charged with an unfair labor practice because of the discharge of an employee engaged in protected activity, the charging party must first show, by a preponderance of the evidence, that the adverse employment action was 'based in whole or in part on antiunion animus—or *** that the employee's protected conduct was a substantial or motivating factor in the adverse action.' (*NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 401, 76 L. Ed. 2d 667, 675, 103 S. Ct. 2469, 2474.) Since motive is a question of fact, the Board may infer discriminatory motivation from either direct or circumstantial evidence, and, because motive involves a factual determination, the Board's finding must be accepted if supported by substantial evidence. [Citation.] Antiunion motivation may reasonably be inferred from a variety of factors, such as an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities [citation], proximity in time between the employees' union activities and their discharge [citation], disparate treatment of employees or a pattern of conduct which targets union supporters for adverse employment action [citations], inconsistencies between the proffered reason for discharge and other actions of the employer [citation], and shifting explanations for the discharge [citations]." (*City of Burbank,* 128 Ill. 2d at 345-46, 538 N.E.2d at 1149-50.)

The hearing officer, after recognizing the task of evaluating the presence of this third factor, then apparently found that this element had been established. The relevant part of his decision is as follows:

"This case is complicated by the fact that there is a wealth of evidence which demonstrates that the District had decided to move Russell from her position as a Class B Secretary long before August 4, 1989. *** Dugger's complaints about Russell's abilities to perform as a Class B Secretary are documented as far back as February of 1989. *** For this reason I find that the District's decision to remove Russell from her position as a Class B Secretary does not in any way violate the Illinois Educational Labor Relations Act.

The record, however, indicates that the District did not plan to both remove her from her position as a Class B Secretary and at the same time terminate her employment with the District. Instead, the record indicates that when Russell was removed from her position as a Class B Secretary the District was planning to offer her any one of a number of other jobs that Wortham and Ryon felt she was qualified to hold. The result of the District's adverse action, then, is not Russell's loss of her position as a Class B Secretary because this was not improper. The termination of Russell's employment by the District in any capacity, her loss of the opportunity to select another position that Wortham and Ryon felt she was qualified to hold is the result of the District's adverse action. The question that remains to be answered is whether or not this adverse employment action would have taken place had Clarice Russell not engaged in protected activity on the afternoon of August 4, 1989." (6 Pub. Employee Rep. (Ill.) par. 1120, at IX—441 (Hearing Officer's Recommended Decision).)

Somewhere in this section of the hearing officer's decision is his conclusion that the District fired Russell because she engaged in union activity, presumably by asserting the right to have a union representative present at the meeting. We must assume that the hearing officer so concluded because he went on to address the District's affirmative defense.

B. *The District's Affirmative Defense*

In finding that the District had not carried its burden with re-

gard to the affirmative defense, the hearing officer made the following findings:

> "The District's allegation that Russell's behavior in Wortham's office on August 4, 1989 is part of a continued pattern of abusive behavior directed at District employees is a mischaracterization of the incident. Russell's behavior on August 4, 1989, was qualitatively different than the 'abusive' behavior the District had previously cited. First of all I do not find her reaction to be in any way improper. Additionally, the situation which prompted Russell's reaction on August 4, 1989 was different than the situations in which Russell had allegedly acted improperly against other District Employees. The behavior Russell exhibited prior to August 4, 1989 was prompted by on-the-job activities that necessitated her interacting with other District Employees. Russell's behavior on August 4, 1989, however, was prompted by a meeting with administrators who were making evaluative comments about her skills and competencies as a District employee. Russell's reaction was a rather benign attempt to defend herself. Had Russell engaged in the sort of exchange she had on August 4 with Wortham and Dugger at a different time with another District employee, and had that exchange been witnessed by Wortham (or Dugger) I do not believe she would have been disciplined. The difference on August 4 was Russell's engaging in protected activity." (6 Pub. Employee Rep. (Ill.) par. 1120, at IX—442 (Hearing Officer's Recommended Decision).)

However, the hearing officer added, in a footnote, the following observation:

> "I do not doubt that Russell had problems interacting with other District Employees. Absent Wortham's testimony that prior to the August 4, 1989 meeting Russell had an option to transfer I could find no violation of the Act if the District had terminated Russell from employment with the District. But the unmistakable fact is that Russell engaged in protected activity on August 4, 1989 and the transfer option disappeared. Conduct of this nature violates the [A]ct." 6 Pub. Employee Rep. (Ill.) par. 1120, at IX—443 n.7 (Hearing Officer's Recommended Decision).

### C. *Review of the Hearing Officer's Decision*

A review of the record reveals that the conclusion of the hearing officer, adopted by the Board, is contrary to the manifest

weight of the evidence. As stated earlier, the law requires Russell to show that the District fired her for engaging in protected activity. Without referring to any one of the specific factors set forth in *City of Burbank*, the hearing officer apparently concluded that Russell had proved antiunion motivation on the part of the District because, after attempts were made to find her another job within the school district, the District took the transfer option away from her after the August 4 meeting. Apparently, the hearing officer believed that Russell was entitled to a job—any job—somewhere in the school district, and that the District acted improperly by taking this option away from Russell by means of termination.

■ Just because the District had previously made attempts to accommodate Russell by finding other positions within the school district does not forever preclude the District from firing her because of her unprofessional conduct. We reject the notion that an employer is prohibited from terminating an employee solely because it has tolerated unprofessional conduct in the past but subsequently decides to tolerate repeated instances of it no further. See *Hardin*, 174 Ill. App. 3d at 186, 528 N.E.2d at 748 (finding that the district had "not extinguish[ed] its right to discipline an employee whose performance continues to deteriorate").

Other than the proximity between Russell's abrupt departure from Wortham's office and her notice from Dugger, not a scintilla of evidence was produced at the hearing which supports the hearing officer's finding that the District fired Russell for engaging in protected activity.

This record contains no evidence that the District had any antiunion animus or had expressed any hostility towards the union. The record further fails to show any knowledge by the District of Russell's union activities (other than her requests to have a union representative present when her superiors were evaluating her job performance), any disparate treatment of employees, any pattern of conduct which targeted union supporters, or any inconsistent or shifting reasons for discharge. See *City of Burbank*, 128 Ill. 2d at 345-46, 538 N.E.2d at 1149-50.

■ In our view, the hearing officer's conclusion that Russell's behavior at the August 4 meeting was somehow different from other instances of misbehavior or mischaracterized by the District is groundless. The February 24 memo written by Dugger specifically states as follows:

> "In situations requiring interaction with others, Clarice often creates the impression that she is being confrontive. In

addition to my own experience in this regard, I have received complaints from Mr. Hoffman, Mr. England, several teachers of driver education, personnel from S&K Cheverolet [*sic*] where we get some of our driver education cars, and personnel within the administration building."

Again, the June 22 Dugger memo relates other abusive personality confrontations Russell had with two other district employees and an outside consultant. Finally, the testimony of Dugger and Wortham is completely contrary to the hearing officer's findings. Dugger and Wortham are themselves District employees who were verbally abused and challenged by Russell.

The hearing officer's findings suggest that Russell's previous, confrontive behavior was somehow different than her behavior towards Dugger and Wortham. In all instances, however, Russell exhibited confrontive, abusive behavior on the job while dealing with other District employees, be they fellow office workers or the executive director of personnel. The hearing officer's conclusion that Russell's behavior was "benign" (which, according to the American Heritage Dictionary means "[o]f a kind disposition," "[m]anifesting gentleness and mildness" (American Heritage Dictionary 123 (1975)) simply does not square with the evidence.

Finally, the hearing officer's conclusion that Russell would not have been disciplined had she engaged in similar verbal exchanges with other District employees is contradicted by memos that were placed in Russell's employment file for precisely similar behavior. The evidence in this record is directly and completely contrary to the hearing officer's findings; accordingly, his findings, adopted by the Board, are against the manifest weight of the evidence.

Not only is the finding that Russell was discharged for engaging in union activity contrary to the manifest weight of the evidence, it is also clear that if this were not so, the District demonstrated by a preponderance of the evidence that Russell would have been terminated even in the absence of the protected activity. (See *Hardin,* 174 Ill. App. 3d at 182-86, 528 N.E.2d at 745-48.) In *Hardin,* this court affirmed the Board's conclusion that the school district had proven its affirmative defense by a preponderance of the evidence because the school district showed a history of poor performance communicated to the complainant in evaluation meetings, while the union could not show disparate treatment. (*Hardin,* 174 Ill. App. 3d at 185-86, 528 N.E.2d at 747-48.) Overall, the evidence presented by the district in *Hardin* was uncontroverted; we conclude the same is true here.

The uncontroverted evidence of Wortham was that Russell was terminated because of Russell's unprofessional conduct towards her and Dugger. Russell's conduct and behavior at the August 4 meeting provided the basis for her termination. Wortham testified as follows:

"Q. [Mr. Cannell, attorney for District:] What impact did her demeanor and her words on that day have upon her decision not to place her in another job?

A. As before that date I just, I—until that date I had just gone on reports of her behavior, I had never seen it in action, and I got to see the, what I had been told about in action that day. I had never seen Mrs. Russell upset before that time or I, it—it had only been reported to me of incidents that had happened by way of Dr. Dugger, and this day I was able to see it for myself what he was talking about."

Wortham was finally able to see for herself the behavior complained of in Dugger's previous memos. In addition, Russell's conduct at the August 4 meeting evidenced an inappropriate *pattern* of behavior that was not isolated to particular contexts or settings.

Similarly, Dugger testified that he decided to terminate Russell from her position because of her behavior both in the past and at the August 4 meeting. The mere fact that Russell had requested union representation had nothing to do with Dugger's decision. Dugger testified as follows:

"Q. [Ms. Coleman-Romeo, attorney for complainant:] Isn't it true that you considered her actions of walking out of the meeting to be insubordination?

A. Not necessarily walking out of the meeting. I—I thought that the manner that she did it was completely inappropriate; but I was used to that. Frankly, I found that Clarice anytime that she was agitated or I gave her something to do that she didn't like, it was almost as if well, I'll do it but I want you to know I don't like it. I was very uncomfortable working with Clarice because she was, to me had a confrontive kind of behavior towards me and I didn't like that and I didn't like it toward other people particularly."

The testimony of Russell, Dugger, and Wortham concerning the August 4 meeting shows that Russell interrupted twice, stood up, and stormed out of the room to get her union representative. The hearing officer put appropriate emphasis on the testimony relating to Russell's conduct and behavior beyond the mere choreography of the August 4 meeting and concluded that "[a]bsent Wortham's testi-

mony that prior to the August 4, 1989 meeting Russell had an option to transfer *I could find no violation of the Act if the District had terminated Russell from employment with the District*." (Emphasis added.) However, Russell's stated desire at the August 4 meeting to get her union representative is not a magical incantation, transforming *by itself* a record devoid of antiunion animus into one which supports a finding of a violation of the Act. The record fully supports the District's affirmative defense; the hearing officer's decision to the contrary was against the manifest weight of the evidence, and so was the Board's decision adopting it.

Reversed.

PRESIDING JUSTICE LUND, specially concurring:

An employee's union involvement must never be a factor in employee discipline considerations. When employee discipline appears to have been affected by union involvement, the discipline or termination should be suspect. In the present case, however, the findings of the hearing officer and the determination of the Board are not justified by the evidence. In my opinion, the danger of a lack of objectivity is present. It is not the function of the Board to provide wholesale job security.

I disagree with Justice Green's statement that the evidence is not "quite as one-sided" as the majority opinion suggests. Russell's request for union representation was an insignificant part of the overall problem. The evidence establishes the District administrative personnel were making substantial efforts to provide alternative employment for an employee unable or unwilling to perform her assigned duties in an acceptable fashion. Russell's abusive responses to this assistance were clearly the factor triggering the termination. Our reversal is called for by the record.

JUSTICE GREEN, specially concurring:

I concur in the decision to reverse the order of the Board as contrary to the manifest weight of the evidence. However, I do not interpret the evidence to be quite as one-sided as does the majority. I write this special concurrence to explain my view of the evidence.

The hearing officer's decision involved several steps. First, he determined that prior to the August 4, 1989, meeting, Russell's supervising authorities had intended to merely change her job rather than to fire her. This was admitted by Dugger's testimony. The hearing officer then concluded that Russell's conduct at the August

4 meeting prior to her request for union representation was not as insubordinate as the Board's witnesses indicated. The hearing officer took into consideration that many people are not likely to be calm when they perceive themselves threatened with loss of a desirable position.

We must give some deference to the hearing officer's interpretation of the witnesses whom he saw and heard. However, the crucial aspect of this evidence is not how reasonable or unreasonable Russell's conduct was but rather the effect it had upon the sentiment of Dugger and Wortham in regard to Russell's continued employment. The hearing officer reasoned that because Russell's response was one which many would be likely to make, the determinative factor in the ultimate decision to fire must have been Russell's request for union representation.

Wortham and Dugger would have been well advised to have returned to the meeting when Russell and her union representative returned. Because of (1) the proximity between the August 4 meeting and the firing (see *City of Burbank*, 128 Ill. 2d at 345-46, 538 N.E.2d at 1149-50), and (2) the fact that Wortham and Dugger did not return, I do not find the decision of the Board, inherent in its order, that Russell's request for union representation had a causal relationship to the firing was contrary to the manifest weight of the evidence. However, the evidence is overwhelming that the accelerating dissatisfaction with Russell's attitude, conduct and work, and the impossibility of finding any solution short of firing was the determinative factor resulting in her firing.

The District had the burden of proving that the firing would have occurred regardless of whether Russell had requested support by the presence of her representative. However, in view of the strength of the evidence, the Board's rejection of that defense was contrary to the manifest weight of the evidence.