THIRD DIVISION
December 13, 2006

No. 1-05-1741

THE BOARD OF EDUCATION OF THE ) 
CITY OF CHICAGO, )
 )
        Petitioner, )
 ) Petition for Review
    v. ) of an Order of the
 ) Illinois Human
DAVID CADY, NORTHEASTERN ) Rights Commission.
ILLINOIS UNIVERSITY, and THE )
ILLINOIS HUMAN RIGHTS COMMISSION, )
 )
        Respondents. )

PRESIDING JUSTICE THEIS delivered the opinion of the court:

This case is before us for direct review of an order of the Illinois Human Rights

Commission (Commission). The Commission adopted the recommended order and decision of an

administrative law judge (ALJ) finding that the Board of Education of the City of Chicago (the

Board)[1] engaged in racial discrimination against the complainant, David Cady, in violation of

section 2-102(A) of the Illinois Human Rights Act (the Act) (775 ILCS 5/2-102(A) (West 1996)),

and that Northeastern Illinois University (NEIU) aided and abetted the Board in violation of

_____

[1] Effective May 30, 1995, the Board was statutorily changed to the Chicago School
Reform Board of Trustees, but no motion to change the name has been made. We will refer to
the Board as named in the caption.

1-05-1741

section 6-101(B) of the Act (775 ILCS 5/6-101(B) (West 1996)).[2]  The Commission awarded

Cady $2,000 in actual damages for emotional distress and awarded other equitable relief.

On appeal, the Board contends that: (1) the Commission lacked jurisdiction over Cady's

charge of racial discrimination because it was filed beyond the time permitted by statute; (2) the

finding of direct evidence of discriminatory intent was against the manifest weight of the evidence

and based upon mere speculation; (3) the Commission erred as a matter of law in finding that

Cady was qualified for the position advertised; and (4) the Commission erred in awarding

damages for emotional distress and prejudgment interest for Cady's one-time viewing of a notice

of a job vacancy for which he was not qualified.  For the following reasons, we reverse the order

of the Commission.

BACKGROUND

This action arose out of a job advertisement posted at NEIU's career placement office in

September 1996.  Cady went to the placement office seeking employment leads and viewed a

posting for a full-time, certified or immediately certifiable music teacher at Taft High School in

Chicago.  The posting was handwritten on a job intake form, and named Thomas Cunningham,

the principal of Taft High School, as the contact person.  The form further listed the job

requirements as follows: "[M]ust conform to Bd of Ed.  Need to [b]e minority."  Cady, who was

white, did not apply for the position.

On February 4, 1997, Cady filed a Complainant Information Sheet (CIS) with the

Department of Human Rights (Department).  Therein, he alleged that he had suffered racial

---

[2] NEIU has not filed a petition for review of the Commission's final order.

1-05-1741

discrimination by NEIU because he was not considered or hired for the music instructor position. He further alleged that it would be futile to apply for the position because a minority person was specified for the job. He also attached the job intake form that he had seen in the NEIU career placement office, indicating that the job was for a position at Taft High School and that the contact person was Cunningham.

A detailed recitation of the procedural history of this case is necessary for a disposition of the jurisdictional issue. On April 7, 1997, the Department sent Cady a notice of an unperfected charge, which named NEIU as the sole respondent. Thereafter on April 17, 1997, Cady perfected the charge by signing and notarizing it, and attaching a document requesting an amendment to the charge, indicating that in addition to NEIU, the respondent "should also be Taft High School." On April 29, 1997, the Department sent Cady a copy of the perfected charge, but failed to make the requested amendments. Subsequently, on May 28, 1997, the record reflects that Cady had a conversation with the Department, again requesting that it add "the Board - Taft High School" as a respondent. An investigator informed him by letter dated June 27, 1997, that the Board could not be charged because Cady did not apply for the teaching position and that NEIU could not be charged because it only posted the job announcement. Thereafter, Cady sent a letter to the Department requesting that it explain why NEIU had not aided and abetted Taft High School's discriminatory practices. On October 28, 1997, the Department held a fact-finding conference with Cady and NEIU. The Board had not been named or notified by the Department as a respondent and, therefore, did not participate in this fact-finding conference. The Department concluded that Cady could not have been discriminated against by being denied a position that he

1-05-1741

did not apply for, and dismissed his charges.

Thereafter, Cady sought review of the dismissal from the Department's Chief Legal Counsel. On April 6, 1998, the Chief Legal Counsel vacated the dismissal, reinstated Cady's charge and remanded it to the Department's charge processing division for additional investigation. Thereafter, the Department sent Cady an amended charge, adding the Board as an additional respondent. On May 28, 1998, Cady perfected the amended charge and on June 3, 1998, the Board was notified for the first time of Cady's amended charge of discrimination. The notice indicated that "the investigator will schedule a fact finding conference and advise you of the scheduled date." The record reflects that no fact-finding conference was held with the Board or Taft High School.

Subsequently, on July 9, 1998, the Board filed a motion to dismiss the charges against it, asserting that the Department lacked jurisdiction to hear the charge as the alleged discrimination occurred 19 months before the Board was added to the charge as a respondent. The Department did not respond to the Board's motion. On July 30, 1998, the Department notified the Board of substantial evidence of a civil rights violation, and on September 11, 1998, the Department filed a complaint of civil rights violation with the Commission on Cady's behalf. Therein, the Department alleged that Cady was discouraged from applying for the music position based upon the wording of the advertisement, and that the Board discriminated against him by failing to hire him based on his race. Cady sought damages for "embarrassment, humiliation, insult, and emotional suffering."

On October 14, 1998, the Board filed a renewed motion to dismiss the complaint for lack

of jurisdiction before the Commission, again asserting that Cady amended his charge19 months after the alleged discrimination.  On December 7, 1998, Cunningham, Taft High School's principal, died.  Thereafter, the Board filed an amended motion to dismiss, noting the Board had been prejudiced by the unreasonable delay in notifying it of Cady's allegations of discrimination due to the death of its chief witness, and the destruction of documentation.  On May 8, 2000, an ALJ denied the motion to dismiss, finding that Cady's charge was timely filed.

A hearing was held on Cady's complaint before another ALJ on June 3 and 4, 2004.  Cady represented himself at the hearing.  Becky Kallem testified that she was a full-time secretary in the placement office at NEIU in September 1996.  As part of her duties, she was responsible for answering telephones and filling out job intake forms from employers seeking to fill various vacancies.  She recalled that she received a telephone call from Cunningham.  He was seeking to post a teacher vacancy at the school.  He "wanted to mention in a way that he wanted to encompass looking for minorities as teachers or wanted to open to minorities or something like that."  She further recalled that she

> "summarized instead of minority encouraged to apply, I think I put minority need
>
> to apply, and I believed that is why we are all here today, but I'm not so sure that
>
> that – in fact, I don't think that's what the principal told me.  I think that in a busy
>
> office * * * I was trying to summarize the scope of what he is looking for [ ] was a
>
> teacher, and I think that maybe I used the word need to apply for my own
>
> summary."

When pressed further to explain her mistake, she reiterated, "[t]o me, what he was looking for

and what it would mean is – minorities are encouraged to apply." Cady's repeated questioning of Kallem on the topic was sustained due to compound questions that mischaracterized Kallem's testimony and due to questions that had already been asked and answered numerous times.

Kallem's impression of her conversation with Cunningham was that it was already September and he wanted a teacher right away "of any color or any person that could teach." When asked whether in hindsight she ought to have written minority encouraged to apply, Kallem responded, "I think that [] could be more - - I have lost my train of thought." Cady then asked her how she came to the conclusion that "it was a mistake," and she responded, "because you're here and I'm in court." She did not recall writing the phrase "must conform to Board of Ed." on the form, and she was not aware that the Board was subject to a consent decree relating to the racial composition of its faculty. Kallem believed that this phrase was one which was probably used by Cunningham and she simply wrote it down. She never transmitted the typed job listing to anyone at the Board or Taft High School and never had any subsequent conversation regarding the job listing with the Board or Taft High School. She recognized Cady as the man who came into the placement office and "had a fit." She described his behavior in the placement office, "throwing magazines on the ground and having a bit of a rage."

Lorn Coleman, the director of the NEIU placement office in September 1996, testified that he was responsible for the actions of his staff members. Kallem told him that she had made a mistake when she wrote "need to be minority" on the job intake form. It was Coleman's impression that the Taft principal had indicated to Kallem that minority candidates were encouraged to apply. At the time of the incident, Coleman verbally reprimanded Kallem for her

error on the form. Within a day or two after Cady came to the office, the job posting was removed from NEIU bulletin boards. Coleman acknowledged that he would have deleted the phrase "need to be minority" if he had seen the listing before it went to print.

Lauren McClellan, a senior project manager in the Board's Department of Human Resources, testified that she was responsible for advising principals about the Board's desegregation consent decree, including implementing the process for principals to request a waiver of its faculty integration goals. The Board was operating under the terms of a 1980 federal desegregation consent decree which required all Chicago Public Schools to maintain a range of compliance within a certain percentage of minority teachers to students depending upon the current system-wide proportions in the district. She further testified that principals who seek to hire a teacher whose race does not enhance that integration must request a waiver and make a compelling argument as to why that teacher should be hired.

McClellan explained that the waiver process is the same for new hires as it is for teachers who are transferred from another school. According to the guidelines for the faculty integration waiver request process, which was admitted at the hearing, the human resources compliance review team meets twice a week to review requests and engages in a three stage process of research, decision, and notification. Principals are not limited to a particular number of requests and are entitled to two appeals per year. McClellan also stated that principals are trained on proper job hiring protocol and are not authorized to limit their job advertisements to individuals of a certain race.

McClellan further testified that Cunningham requested to fill the vacant music position at

Taft High School by transferring Aldona Nadzius, a white female, from another Chicago Public School. Nadzius was hired in October 1996, one month after the job was posted at NEIU, as a regularly appointed teacher to fill the vacancy for the full-time music position. She held a doctoral degree in education, had seven years of experience teaching music in K-12 classrooms, and her teaching certificate contained an endorsement in both instrumental as well as vocal music.

Cady testified that he saw the job posting for the full-time music teacher position at NEIU's placement office and became enraged after reading the language "need to be minority" included on the posting. After viewing the posting, he "felt pre-empted from applying for the position." He acknowledged that he was not endorsed to teach music full-time at the high school level, and was not academically accredited in music, but stated that his life experience with music, "qualifies me to some extent to be a non full-time instructor of a music course." He testified that he played several instruments in his youth, took five college credit hours of music, and was a member of a band. He had no classroom experience teaching music. Additionally, he testified that he was aware that "cadre" substitute teachers are hired through the Board's Office of Substitute Services. In 1996, he had not applied to be considered as a "cadre" substitute teacher.

After briefing and argument, the ALJ issued a recommended order and decision, concluding that Cady established direct evidence of race discrimination against the Board by showing that Taft High School sought only minority applicants for an open teaching position in violation of section 2-102(A) of the Act. 775 ILCS 5/2-102(A) (West 1996). Additionally, the ALJ determined that Cady established that NEIU aided and abetted the Board in discriminating against him on the basis of race when it posted the job announcement on its job board seeking

1-05-1741

only minority candidates for a job in violation of section 6-101(B) of the Act. 775 ILCS 5/6-101(B) (West 1996).

Cady was awarded $2,000 in damages as well as prejudgment interest for the emotional distress caused by viewing the job posting. The ALJ found that Cady demonstrated credible evidence of embarrassment and humiliation when he had an angry outburst, throwing magazines on the floor in the NEIU placement office upon viewing the job posting. As an additional remedy, the Board was required to notify Cady of the next available introduction to music teacher position and accept his application should he choose to apply. Furthermore, the Board and NEIU were respectively to cease and desist from further discrimination on the basis of race and cease and desist the aiding and abetting of race discrimination. On February 1, 2005, the Commission adopted the ALJ's recommended order and decision. The Board filed its timely petition for review on June 2, 2005.

ANALYSIS

Initially, we address the Board's argument that Cady's charge of discrimination against it was not timely filed. Section 7A-102 of the Act sets forth the procedures for filing a charge of discrimination. Specifically, section 7A-102(A)(1) provides that an aggrieved party must file a charge of discrimination under oath or affirmation within 180 days after the date that the alleged civil rights violation has been committed. 775 ILCS 5/7A-102(A)(1) (West 1996). The claim must be in such detail as to substantially apprise the concerned parties of the time, place, and facts surrounding the alleged violation. 775 ILCS 5/7A-102(A)(2) (West 1996). Once these requirements are met, the Department is vested with the responsibility, within ten days of the date

on which the charge was filed, to serve a copy of the charge on the respondent.  775 ILCS 5/7A-102(B) (West 1996).

The petitioner's compliance with the 180-day filing requirement of section 7A-102(A)(1) is a condition precedent to his right to seek a remedy and is required to vest the Commission with subject matter jurisdiction of the charge.  Weatherly v. Illinois Human Rights Comm'n, 338 Ill. App. 3d 433, 437, 788 N.E.2d 1175, 1178-79 (2003).  Whether the Commission had jurisdiction is a question of law subject to *de novo* review.  Ferrari v. Illinois Department of Human Rights, 351 Ill. App. 3d 1099, 1103, 815 N.E.2d 417, 422 (2004).

It is undisputed that the alleged discrimination occurred on September 9, 1996, and that Cady filed his CIS on February 4, 1997, well within the 180-day limitations period.  He then perfected his charge on April 17, 1997, by signing and notarizing it.  This court has held that an unverified CIS constitutes an unperfected charge and, if filed within the 180-day time limit, is considered timely filed as long as the charge is perfected within a reasonable period of time thereafter.  Gonzalez v. Illinois Human Rights Comm'n, 179 Ill. App. 3d 362, 371, 534 N.E.2d 544, 549 (1989).  Nevertheless, the Board argues that it did not receive timely notice of the charges against it where Cady did not amend his charge naming it as a respondent until May 27, 1998, almost two years after the alleged violations.  Thus, it argues that the amended charge could not relate back to the original filing in compliance with the Department's rules relating to the naming of additional parties.  We disagree.

The record reflects that Cady's CIS substantially complied with the requirements under the Act and was sufficient to require the Department to serve notice on the Board and prepare

formal charges which should have included the Board as a respondent. Cady attached the alleged

discriminatory job advertisement on NEIU letterhead which clearly indicated that it was a job

intake form, that the job was a position for a full-time music teacher at Taft High School, and that

the contact person was the principal of the school.

In Muraoka v. Illinois Human Rights Comm'n, 252 Ill. App. 3d 1039, 625 N.E.2d 251

(1993), this court addressed a similar set of facts in which the complainant had failed to name a

particular respondent, but referenced the respondent throughout her CIS. Muraoka, 252 Ill. App.

3d at 1046-1048, 625 N.E.2d at 257,  The court held that "it is the Department's obligation to

review the totality of the facts as set forth in the [CIS] and it is the Department's obligation to

ascertain whom the complainant fairly charges with discrimination." Muraoka, 252 Ill. App. 3d at

1046-47, 625 N.E.2d at 257. It is then the Department's responsibility to correctly process a

complainant's CIS and promptly serve notice of the charge on the respondent. Muraoka, 252 Ill.

App. 3d at 1048, 625 N.E.2d at 258.

Here, Cady's CIS contained clear references to Taft High School and Cunningham, yet the

Department failed to include the Board in its formal charges. When the Department prepared its

formal charges, Cady informed the Department that Taft High School should have been named as

a respondent on several occasions. Although the Board argues that the respondents in Muraoka

were closely connected and had actual notice of the charges, the court did not base its reasoning

or holding on this fact. Furthermore, despite the Board's contention, Cady did not need to amend

his charge under the Department rules to add a respondent pursuant to section 2520.360(c) of the

Illinois Administrative Code. Ill. Admin. Code 1991, tit. 56, §2520.360(c). Rather, as stated in

<u>Muraoka</u>, at most, Cady "needed only to give notice to the Department that it had failed to properly prepare the formal charges" (<u>Muraoka</u>, 252 Ill. App. 3d at 1049 n.2, 625 N.E.2d at 258 n.2), which he did on April 17, 1997, and again thereafter.

Ultimately, in the present case, the Department conformed the formal charges to the factual allegations contained in Cady's original CIS in May 1998. Accordingly, despite the Department's failure to fulfill its statutory obligations, Cady's charge against the Board was timely filed. We acknowledge the Department's delay in notifying it of the charges may have caused the Board prejudice, but must balance that prejudice with Cady's right to a hearing on his civil rights claim. Additionally, we reject the Board's request to find the Department liable for the costs it incurred as a result of the delay in notification. It has not cited to any authority under which this court could impose such a remedy nor does it identify the costs it incurred that it otherwise would not have incurred had the Department notified it promptly.

We next consider the Board's contention that the Commission's finding of racial discrimination was against the manifest weight of the evidence. It is well settled that the Commission's findings and conclusions on questions of fact are deemed *prima facie* true and correct (735 ILCS 5/3-110 (West 2004)), and "shall be sustained unless the [reviewing] court determines that such findings are contrary to the manifest weight of the evidence" (775 ILCS 5/8-111(A)(2) (West 2004)). A decision of an administrative agency is contrary to the manifest weight of the evidence if the opposite conclusion is clearly evident from the record. <u>City of Belvidere v. State Labor Relations Board</u>, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998). We may not substitute our judgment for that of the Commission, nor may we reweigh any of the

evidence presented at the hearing.  Zaderaka v. Illinois Human Rights Comm'n, 131 Ill. 2d 172, 180, 545 N.E.2d 684, 688 (1989).

The Act makes it unlawful "for any employer to refuse to hire * * * or to act with respect to recruitment * * * on the basis of unlawful discrimination.  775 ILCS 5/2-102(A) (West 1996). The term "unlawful discrimination" includes discrimination against a person because of his race. 775 ILCS 5/1-103(Q) (West 1996).  In analyzing discrimination cases under the Act, our Supreme Court has adopted the analytical framework set forth in United States Supreme Court decisions addressing claims under Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act.  Zaderaka, 131 Ill. 2d at 178, 545 N.E.2d at 687.  Under this analysis, a complainant may prove discrimination in one of two ways.  He may prove his case under the direct method of proof by establishing that the employer had a discriminatory motivation (Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989), *modified by statute*, 42 U.S.C. § 20000e-2(m), § 2000e-5(g)(2)(B)(i) (1994)), or by the indirect method of proof by making out a *prima facie* case and shifting the burden of production as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 207, 93 S. Ct. 1817 (1981).

Under the direct method of proof, a complainant may present either direct or circumstantial evidence that the employer's recruitment decisions were motivated by an impermissible purpose, such as race.  Rudin v. Lincoln Land Community College, 420 F.3d 712, 720 (7th Cir. 2005).  Direct evidence of discrimination is evidence that, if believed by the trier of fact, would prove discrimination without reliance on inference or presumption.  Rudin, 420 F.3d

at 720. In short, "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000), *citing* Troupe v. May Department Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).

The complainant may also present "a convincing mosaic" of circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker. Rhodes v. Illinois Department of Transportation, 359 F.3d 498, 504 (7th Cir. 2004). The circumstantial evidence must point directly to a discriminatory reason for the employer's action at issue. Rhodes, 359 F.3d at 504. Under either approach, the complainant must establish that a discriminatory reason motivated the decision maker in soliciting and hiring candidates for the position. Rudin, 420 F.3d at 721. The discrimination must be established by a preponderance of the evidence. 775 ILCS 5/8A-102(I)(1) (West 2004).

In the instant case, as the ALJ pointed out, the "stumbling block" to proving discriminatory motive is in establishing the requisite intent of the decision maker. Principal Cunningham was dead at the time of the hearing and, therefore, unable to testify to the conversation he had with Kallem about the job advertisement. Accordingly, there was no direct evidence in the sense of an admission by Cunningham that his actions were based on the prohibited animus. Rather, as the ALJ indicated, Kallem's testimony regarding the conversation and her handwritten job posting were relied on to establish whether Cunningham "actually instructed Kallem to write the statement 'need to be minority' on the job intake form."

Kallem testified repeatedly that she believed that Cunningham wanted the job posting to

express that minorities were encouraged to apply and she made a mistake by summarizing his words and writing on the job intake form, "need to be minority." She stated that she attributed her mistake in summarizing the gist of the conversation to being in a busy office at a busy time of year. Additionally, Coleman corroborated Kallem's testimony in that shortly after the incident, she told Coleman she made a mistake in writing "need to be minority" on the intake form, and he reprimanded her for her error.

Nevertheless, the ALJ rejected Kallem's testimony, finding instead that she "wrote on the form exactly what the principal told her during the conversation," and that the evidence "unequivocally establishes that the Taft High School principal instructed Kallem that the school wanted minority applicants for its open music teacher position and so she indicated that fact on the form reviewed by [Cady]." The ALJ further found that the principal's intent was "clear, direct evidence of race discrimination against [Cady] since he is white and precluded from applying for the job by the plain language of the job requirements contained in the posting."

To reach this conclusion, the ALJ relied upon three unfounded inferences and presumptions. Initially, the ALJ considered the phrase "must conform to Bd. of Ed." with the phrase "need to be minority" on the handwritten job intake form. She deduced that since Kallem would not have summarized the first phrase in her own words, because she was unaware of the federal consent decree to which the Board was subject, she therefore would not have summarized the next phrase. This conclusion is based upon many layers of speculation and directly contradicts Kallem's unimpeached testimony in this regard.

Although findings of fact by an administrative agency are considered to be *prima facie*

true and correct, a fact finder cannot arbitrarily or capriciously reject the testimony of an unimpeached witness where the testimony of the witness is " 'neither contradicted, either by positive testimony or by circumstances, nor inherently improbable.' " Crabtree v. Illinois Deptartment of Agriculture, Division of Agricultural Industry Regulation, 128 Ill. 2d 510, 518, 539 N.E.2d 1252, 1257 (1989), *quoting* People ex rel. Brown v. Baker, 88 Ill. 2d 81, 85, 430 N.E.2d 1126, 1127 (1981). Indeed, as a threshold matter, it is pure speculation to assume that the first phrase "must conform to Bd. of Ed.," is even referring to the federal desegregation consent decree. It could just as easily mean that the job candidate must conform to any myriad of Board of Education requirements. We have no way of discerning the meaning of this phrase. Accordingly, to assume the meaning of the first phrase and then use it to make an assumption about the second phrase was error.

Secondly, in reaching her conclusion, the ALJ relied upon her interpretation of the consent decree waiver process. She indicated that the process was an arduous task that "could only be sought two times per year" by the principal. Based upon this process, she "assume[d]" that additional time would be added to the hiring process if a non-minority teacher was selected for hire. She also considered that it was September and the principal needed to hire someone right away to fill the position. As a result, she deduced that the principal would not have had the leisure of submitting an applicant to the waiver process, and "the easiest way to remain in compliance with the desegregation order would be to hire a minority candidate." Therefore, she assumed that the principal told Kallem that the job was only open to minority candidates.

These assumptions are against the manifest weight of the evidence presented at the

hearing. Contrary to the ALJ's findings, according to the guidelines for the waiver process, as submitted by the Board, Cunningham was not limited in the number of waiver requests he could seek, only in the number of appeals available to him. Furthermore, the evidence adduced at the hearing was that the individual who was hired for the position, Nadzius, was required to go through this very waiver process, and indeed was hired within a month from the time the job was posted. Thus, the ALJ's assumption that the waiver process was arduous and the principal would not have the leisure to pursue this route is directly contradicted by the evidence in the record.

Thirdly, the ALJ focused in particular on one page in Kallem's fifty pages of testimony that Kallem attributed her mistake to "hindsight" because of the fact that she was "in court." The ALJ "construed [this] to mean that the only mistake [Kallem] made was actually writing what was told to her on the form." The actual testimony was as follows:

"CADY:          * * * [D]id I understand your testimony to be that you were

confused and that in hindsight you ought to have written minority

encouraged to apply? Is that what you testified earlier?

KALLEM:      I didn't say I was confused. I said I made a mistake.

Q:              Okay. And that in hindsight you ought to have written minority

encouraged to apply instead?

A:              I think that that could be more – I have lost my train of thought.

Q:              Okay. Well, let me ask you this. Why do you now say that it was a

mistake? How did you come to this conclusion?

A:              Because you're here and I'm in court."

Intially, we note that the question was confusing because it is not evident what "it" refers to in the sentence "it was a mistake." Kallem had testified that at the time of the conversation with Cunningham, she believed she was told that minorities were encouraged to apply, but she believed that she erroneously summarized the information given to her. That Kallem may have only realized the legal import of her erroneous transmission now that she was in court does not impeach her prior testimony that she indeed wrote down something other than what was conveyed to her at the time.

Moreover, during the questioning by Cady, Kallem indicated that she was confused by the questions, and that she had lost her train of thought. Accordingly, it was against the manifest weight of the evidence to construe this one response to a line of unclear questioning, to mean the opposite of what she had testified to at the hearing. Accordingly, notwithstanding the deference generally accorded to an agency's findings of fact, the finding of discriminatory motive on the part of the principal in recruiting for the music position was not based upon the evidence. Therefore, the record does not support the Commission's conclusion that the Board engaged in race discrimination against Cady.

Furthermore, the analysis under the direct method of proof does not end here. Under Price Waterhouse and the 1991 Civil Rights Act amendments, even if a complainant can prove that discrimination was a motivating factor in the adverse employment action, the burden of persuasion shifts to the employer. Price Waterhouse, 490 U.S. at 258, 104 L. Ed. 2d at 293, 109 S. Ct. at 1795; 42 U.S.C. § 2000e-5(g)(2)(B)(i) (1994). If the employer proves that it would have taken the same action in the absence of discrimination, it can limit the complainant's relief to

attorney's fees, costs, declaratory and certain injunctive relief. 42 U.S.C. 2000e-5(g)(2)(B)(i) (1994); Lalvani v. Illinois Human Rights Comm'n, 324 Ill. App. 3d 774, 790, 755 N.E.2d 51, 65 (2001).

Here, the Board presented an affirmative defense that it would not have hired Cady even in the absence of the alleged discrimination because he was not qualified for the music teacher position. The ALJ found that since the job advertisement only stated that the candidates needed to be certified to teach in Illinois and Cady had a valid teaching certificate, he was minimally qualified for the music teacher position. Contrary to this finding, as a matter of law, according to sections 21-1 and 21-1b of the Illinois School Code, if a teacher's certificate does not contain an endorsement for a particular subject, then the teacher is not legally qualified to teach that subject. 105 ILCS 5/21-1, 5/21-1b (West 1996); Lewis-Connelly v. Board of Education of Deerfield Public Schools, District 109, 277 Ill. App. 3d 554, 558, 660 N.E.2d 283, 286 (1996).

Here, Cady was not endorsed to teach music and therefore not legally qualified for the job at Taft High School. Indeed, the job posting sought a full-time instructor of music, and Cady admitted that he was not qualified to teach music as a full-time instructor, but, rather, believed that he could have taught as a cadre substitute. However, at the time of the job posting, he had not even applied for a substitute teaching certificate. Accordingly, it was error for the ALJ to find Cady minimally qualified for the job posting in September 1996. Consequently, even if Cady had established a discriminatory motive in recruiting for the music position, the Board established by a preponderance of the evidence that it would not have hired Cady in the absence of any discrimination and, therefore, Cady was not entitled to actual damages.

1-05-1741

Additionally, we reject the ALJ's finding, as a matter of law, that despite Cady's failure to apply for the position, Cady was entitled to relief. The ALJ determined that Cady was not required to apply for the position because it was clear that the application would be futile since the plain language of the posting invited only minorities to apply. The United States Supreme Court has acknowledged that there is an exception to the general requirement that a complainant formally apply for a position, especially in cases of severe and pervasive discrimination. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977). Nevertheless, a nonapplicant must show (1) that he would have applied for the job but for discrimination; and (2) that he would have been discriminatorily rejected had he applied. International Brotherhood of Teamsters, 431 U.S. at 367-38 & n.52, 52 L. Ed. 2d at 435 & n.52, 97 S. Ct. at 1871 & n.52. Here, we have determined that Cady was not a victim of discrimination, and even if it was futile for him to apply based upon the job posting, Cady would not have been discriminatorily rejected for the job because he was not qualified. Accordingly, the ALJ erred as a matter of law in finding that Cady was entitled to any relief.

Additionally, we note that Cady would not have been able to establish racial discrimination under the indirect method of proof set forth in McDonnell Douglas. He was not qualified for the position, and he was not passed over in favor of a person not having the forbidden characteristic because Nadzius, who was ultimately hired, was also white. McDonnell Douglas, 411 U.S. at 802, 36 L. Ed. 2d 207, 93 S. Ct. 1817.

Accordingly, for all of the foregoing reasons, the order of the Commission is reversed.

Reversed.

1-05-1741

GREIMAN and KARNEZIS, JJ., concur.