2025 IL App (1st) 230983-U
No. 1-23-0983

FIRST DIVISION
July 7, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| MUHAMMAD SALEEM, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2019 L 012482 |
| | ) | |
| GLOBAL EXPERIENCE SPECIALISTS, INC., | ) | |
| | ) | The Honorable |
| Defendant-Appellee. | ) | John J. Curry, Jr., |
| | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1　　*Held:* The trial court did not err when it found that the former employee failed to provide sufficient evidence that the employer was liable under a cat's paw theory of liability, but the trial court erred when it granted the employer's motion for summary judgment because there were questions of fact regarding whether (1) the former employee was meeting legitimate business expectations, (2) the former employee was treated differently than similarly-situated employees and (3) whether the employer's reason for discharge was a pretext.

¶ 2　　This matter is a claim brought by plaintiff-appellant, Muhammad Saleem ("Saleem"), against his former employer defendant-appellee Global Experience Specialists, Inc. ("GES"), under the Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.* ("Illinois Human Rights Act" or

"Act"), for national origin and religious discrimination. On December 6, 2022, the trial court granted GES's motion for summary judgment and entered judgment against Saleem. On May 2, 2023, the trial court denied Saleem's motion to reconsider the December 6, 2022 order.

¶ 3        Saleem appeals the trial court's decision arguing that the court erred in determining that there were no genuine issues of martial fact as to (1) whether Saleem was meeting GES' legitimate business expectations and (2) his supervisor's, Raj Velpuru, bias towards his national origin and religion.

¶ 4                                    I. BACKGROUND

¶ 5        Saleem is Muslim and his national origin is Pakistan. Saleem worked as a senior database administrator ("DBA") for GES, a global event planning and marketing company, from January 2017 to May 8, 2018. He was an "at will" employee at GES. His responsibilities included providing technical expertise, performance tuning of GES' computer systems and applications, and ensuring performance and reliability of GES' database systems. In 2017, Saleem was appointed the team lead for the DBAs and was rated as "meeting expectations" by his then-supervisor, Allen Evans. During this time, on July 31, 2017, Saleem also received an award from GES "for delivering results with significant business impact that were above and beyond required."

¶ 6        On January 8, 2018, Saleem was reassigned to report to Supervisor Raj Velpuru ("Velpuru"). Velpuru is Hindu and his national origin is India. Velpuru was born and raised in India, and he went to college in India. While in school, Velpuru learned about the history of conflicts between Hindus and Muslims in India and conflicts between Indians and Pakistanis. Velpuru sings as a hobby. He has performed at charity events and organizations and has posted his performances on his YouTube channel. In particular, one performance Velpuru posted depicted a screen behind him which read "All proceeds from today's event will go to the honor of the brave

hearts. We salute our heroes," with the Indian flag displayed next to the text. Later in the performance, while Velpuru was singing on stage, the screen behind Velpuru depicted a picture of the Indian flag, military personnel, and airplanes.

¶ 7 Saleem and Velpuru originally met in 2017 prior to Velpuru becoming Saleem's supervisor. At that time, Saleem testified that Velpuru asked where he was from and Saleem responded that he was from Rawalpindi, Pakistan. As a supervisor, Velpuru had access to Saleem's employment application and resume which indicated that he studied in Pakistan. Velpuru also testified that he was aware that Muslim people often name their children Muhammad, which is Saleem's first name, after the Muslim prophet. While Velpuru was Saleem's supervisor, Saleem asked him for time to attend Friday prayers. Velpuru testified that he was not aware of any other religion that conducts congregational prayers on Fridays other than Islam.

¶ 8 Shortly after becoming Saleem's supervisor, in early January of 2018, Velpuru stripped Saleem of his team leader duties and excluded him from communications on team members' assignments. Then, on January 19, 2018, Velpuru emailed his supervisor, Amar Barua ("Barua"), ("January 19th email") to express that he was "extremely unhappy with [Saleem's] ways in [the] team." Velpuru's email stated that his displeasure went back for "months of [Saleem's] work" and that he had previously discussed these issues with Barua. Barua testified that he could only recall a discussion with Velpuru about Saleem's post-cloning issues. However, Barua could not recall any specific details of the conversation or any other issues Velpuru brought to his attention prior to the email. Velpuru also testified that he could not recall speaking to Barua prior to the email on January 19, 2018.

¶ 9 Velpuru's email laid out three bullet points which explained his issues with Saleem's work. First, Velpuru stated that Saleem "[d]oes not follow instructions" and that he had seen it "during

Foundation go live." He also claimed that Saleem did not display good DBA expertise because his solutions did not resolve problems and/or created additional problems. His final bullet point stated that Saleem "does not follow the process laid out and takes shortcuts." Velpuru noted that the clone process was an example of this and stated generally that there had been many issues in the past six months. Velpuru concluded his email by stating "I seriously want to think of other options on [Saleem] before it's too late. I wanted to give it time after I took over the DBA team and see whether it is possible to change his ways. But, with all the recent happenings I am seriously concerned that critical system[s] like CORE production is in his hands. I have very little confidence that CORE is in safe hands."

¶ 10                                  A. COREDB05 Shutdown

¶ 11          GES's information technology ("IT") department supports two types of computer databases: (1) production and (2) development. Production databases are used by GES and its customers to perform business transactions which are subject to audits, whereas development databases are used for IT testing prior to implementation on the production databases. GES's production database is called CORE.

¶ 12          On January 22, 2018, three days following Velpuru's initial email to Barua, Saleem accidentally shut down one of GES's two CORE production database systems, COREDB05. Saleem had intended to shut down a development database not used by customers. He acknowledged the mistake and informed his colleagues that he "accidentally shut down COREDB05" and wrote "[i]t was my fault and I take full responsibility."

¶ 13          The shutdown lasted approximately twenty minutes, after which it was restored to full use. During the shutdown, GES's other production database, COREDB06, remained operational. Any users who were logged into COREDB05 at the time of the shutdown would have received an error

message. The user would then have to refresh their page or, alternatively, open a new browser and re-enter login credentials to be rerouted to COREDB06. One user reported that their work was interrupted during the shutdown.

¶ 14                                    B. Saleem's Termination

¶ 15          Following the shutdown, on January 31, 2018, Velpuru emailed Lisa Ringo ("Ringo") and Julie Holland ("Holland") from GES's human resources department ("HR") to request Saleem's termination. Velpuru's email identified five performance issues ("January 31st email"). One of the identified performances issues was the shutdown of COREDB05. Velpuru stated in the email that Saleem had "shutdown the production instead of shutting down development." The remaining performance issues Velpuru raised in his January 31st email were as follows: (1) inability to migrate code; (2) failure to plan or perform work; (3) incorrect diagnosis during a system investigation; (4) incompetence in cloning process.

¶ 16          On April 9, 2018, Velpuru sent a follow up email which again requested Saleem's termination. The email indicated that the reasons he requested Saleem's termination were (1) lack of expertise, and (2) lack of follow-through on action points leading to issues. On April 9, 2018, Barua, Ringo, and Holland approved Velpuru's recommendation to terminate Saleem. Then, on May 7, 2018, Plaintiff was terminated and eventually replaced by a white male, who is not Pakistani or Muslim.

¶ 17                                    C. Procedural History

¶ 18          On July 23, 2018, Saleem filed a charge for discrimination under the Illinois Human Rights Act, 775 ILCS 5/2-101 *et seq.*, with the Illinois Department of Human Rights ("Department"). On August 20, 2019, the Department concluded that there was substantial evidence that GES violated Saleem's civil rights when it terminated Saleem based on his religion and national origin.

¶ 19     Then, on November 12, 2019, Saleem filed a complaint in the Circuit Court of Cook County. In his complaint, Saleem requested compensatory damages and other relief proscribed under the Illinois Human Rights Act. See 775 ILCS 5/2-101.

¶ 20     On August 19, 2022, Saleem filed a motion for sanctions and a motion for partial summary judgment. Saleem requested sanctions pursuant to Illinois Supreme Court Rule 219(c) based on allegations that GES failed to preserve and produce documents Saleem requested. In his motion for partial summary judgment, Saleem requested a finding that HR approved Saleem's termination based on false information provided by Velpuru that Saleem had shut down CORE.

¶ 21     Concurrently, GES filed its own motion for summary judgment requesting judgment be awarded in its favor on all counts. GES's motion for summary judgment argued that Saleem cannot present a *prima facie* case of discrimination because Saleem failed to present evidence that (1) GES decisionmakers were unaware of his religion and national origin, (2) he was meeting GES's legitimate business expectations, and (3) he cannot point to similarly situated individuals that GES treated more favorably. Instead, as GES argued, Saleem was lawfully discharged for his failure to meet reasonable performance expectations for his employment. Specifically, GES argued that Saleem could not demonstrate that he met GES's legitimate business expectations because he admitted to accidentally or mistakenly shut down one of the company's two production databases. Additionally, GES argued that Velpuru's reports detailing dissatisfaction with Saleem's performance and errors in Saleem's work provided further evidence that he could not demonstrate that he met GES's legitimate business expectations. Finally, GES argued that Saleem could not demonstrate that GES's articulated reasons for terminating Saleem did not actually motivate its decision or that the reasons were insufficient to motivate its decision.

¶ 22        In response, Saleem argued that Velpuru had misrepresented the shutdown incident as a complete shutdown of all of GES's production databases and that GES relied on this false information. Saleem also argued that Velpuru made other false or misleading statements about his performance which GES failed to verify or investigate prior to terminating him. Further, Saleem argued that these false statements and the failure to follow GES's progressive discipline policy was evidence of pretext.

¶ 23        On November 15, 2022, the circuit court denied Saleem's motion for sanctions and motion for partial summary judgment. Following, on December 6, 2022, the circuit court granted GES' motion for summary judgment and dismissed Saleem's claims. The court found that there was no genuine issue of material fact that Saleem failed to meet GES' legitimate business expectations, that no GES employee had made any statement or committed any act which showed that employee harbored invidious bias or prejudice against Saleem due to his religion or national origin, and that Saleem failed to present any evidence that the reasons for his termination were pretextual. Based upon the circuit court's findings, it concluded that Saleem was unable to prove that his termination was either directly or proximately caused by unlawful discrimination and was not entitled to relief under the Act.

¶ 24        On January 5, 2023, Saleem filed a motion to reconsider arguing that the circuit court erred in granting GES's motion for summary judgment. On May 2, 2023, the circuit court denied the motion to reconsider. In its order, the circuit court reasoned that Saleem's motion to reconsider mischaracterized the evidence and failed to present evidence to support his allegation that the legitimate reason GES provided for his termination was pretextual. The circuit court also noted that Saleem improperly raised new theories of liability and arguments that he had not originally presented in response to GES's motion for summary judgment.

¶ 25                                    II. ANALYSIS

¶ 26        On appeal, Saleem does not argue that the circuit court erred when it denied his motion for sanctions or his motion for partial summary judgment. Instead, Saleem only argues that the circuit court erred in granting GES's motion for summary judgment and dismissing his claims, and subsequently denying his motion to reconsider. Saleem claims that the trial court erred in determining that there was no genuine issue of material fact as to whether he was meeting GES' legitimate business expectations. He also claims that the trial court erred in determining there was no issue of material fact as to Velpuru's bias towards Saleem's national origin and religion. In response, GES argues that Saleem did not present any evidence which raised a genuine issue of material fact that (1) he was meeting GES' legitimate business expectations, (2) he had any comparators that were treated differently, (3) the reason GES terminated him was pretextual, and (4) Velpuru had knowledge of or harbored bias against Saleem for his national origin or religion.

¶ 27        Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c). "In considering a motion for summary judgment, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the nonmovant." *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill. 2d 90, 131-32 (1992). Material facts, for purposes of a motion for summary judgment, are facts that might affect the outcome of the case under the applicable substantive law. *GreenPoint Mortgage Funding, Inc. v. Hirt*, 2018 IL App (1st) 170921, ¶ 17. Summary judgment should not be entered where material facts are disputed or where material facts are undisputed but reasonable persons might draw

divergent inferences from those facts. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004).

¶ 28    On a defendant's motion for summary judgment, a plaintiff is not required to establish his case as he would at trial, however, he must present some evidence that would arguably entitle him to judgment at trial. *Ross v. Dae Julie, Inc.*, 341 Ill. App. 3d 1065, 1069 (1st Dist. 2003) (a plaintiff "must present some evidence to support each element of his cause of action"); *Benner v. Bell*, 236 Ill. App. 3d 761, 769 (4th Dist. 1992). "The purpose of a motion for summary judgement is to determine whether a triable question of fact exists, not to try a question of fact. The trial court cannot make credibility determinations or weigh the evidence at the summary judgment stage." *Gulino v. Economy Fire and Casualty Co.*, 2012 IL App (1st) 102429, ¶ 25 (internal citations omitted); see *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 ("*** credibility determinations and the resolution of inconsistencies and conflicts in testimony are for the jury."). We review the circuit court's ruling on GES's motion for summary judgment and Saleem's motion to reconsider *de novo*. *O'Shield v. Lakeside Bank*, 355 Ill. App. 3d 834, 838 (1st Dist. 2002).

¶ 29    Pursuant to the Illinois Human Rights Act, it is unlawful for an employer to discriminate against an employee based on national origin or religion. 775 ILCS 5/1-103(Q), 2-102(A). In analyzing employment discrimination actions brought under the Illinois Human Rights Act, the Illinois Supreme Court adopted the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; *Zaderaka v. Illinois Human Rights Commission*, 131 Ill. 2d 172, 178-79 (1989). To withstand a motion for summary judgment in an employment discrimination case, a plaintiff must present "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race,

ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Lau v. Abbott Labs*, 2019 IL App (2d) 180456, ¶ 39; *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

¶ 30                                    A. Direct Discrimination - Cat's Paw

¶ 31        An employee alleging discrimination may proceed under the direct method of proof if the employee can demonstrate "either an acknowledgement of discriminatory intent or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (quoting *Overly v. KeyBank National Association*, 662 F.3d 856, 865 (7th Cir. 2011); *Board of Education v. Cady*, 369 Ill. App. 3d 486, 495 (1st Dist. 2006). Direct evidence of discrimination is evidence that, if believed by the trier of fact, would prove discrimination without reliance on inference or presumption. *Cady*, 369 Ill. App. 3d at 495. Direct evidence of discrimination requires either (1) the decisionmaker to "essentially" admit that his actions were based on discriminatory animus or (2) the plaintiff to present "a convincing mosaic" of circumstantial evidence that points directly to intentional discrimination. *Id.*; see *Troupe v. May Department Stores Company*, 20 F.3d 734, 736 (7th Cir. 1994) (noting that circumstantial evidence of direct discrimination can be presented by (1) suspicious and ambiguous statements and behavior towards the protected group, (2) employees who are not in the protected group systemically receiving better treatment, and (3) an employer's stated reason for different treatment towards the plaintiff is unworthy of belief – a mere pretext for discrimination).

¶ 32        Saleem has not offered any evidence that any of the decisionmakers, Barua, Holland, and Ringo, harbored discriminatory feelings toward him. Thus, he relies on a cat's paw theory of liability. Under this theory, liability for discriminatory action is premised on the ability of a culpable actor (also referred to as a "biased subordinate") to use an innocent decisionmaker as an

"unknowing tool" of the former's animus. *Miller v. Polaris Labratories, LLC*, 797 F.3d 486, 490 (7th Cir. 2017); see *Cipolla v. Village of Oak Lawn*, 2015 IL App (1st) 132228, ¶ 44. To succeed on this theory, the plaintiff must demonstrate that (1) the biased subordinate actually harbored discriminatory animus against the plaintiff, and (2) that the biased subordinate's scheme was the proximate cause of the adverse employment action. *Johnson*, 726 F.3d at 914.

¶ 33      Saleem claims that Velpuru, acting with discriminatory animus towards his religion and national origin, induced Barua, Holland, and Ringo to terminate his employment. He argues that the trial court erred in finding that he failed to present evidence that Velpuru held discriminatory animus towards him. Specifically, he takes issue with Velpuru's deposition testimony characterizing many statements as lies and self-serving testimony. He argues that the trial court failed to consider the evidence as a whole and draw reasonable inferences in his favor.

¶ 34      Saleem presented sufficient evidence to demonstrate a genuine issue of material fact as to whether Velpuru was aware that his religion is Islam and his nationality is Pakistani. Saleem testified that Velpuru asked Saleem where he was from and he responded Rawalpindi, Pakistan and Velpuru also had access to Saleem's employment file which stated that he studied in Pakistan. Velpuru testified that he was aware that Muslims are commonly named Muhammad, Saleem's first name. Additionally, Velpuru allowed Saleem to take time off for Friday prayer and testified that he was unaware of any religion, other than Islam, which conducted prayer on Fridays. In his deposition testimony, Velpuru denied knowledge of Saleem's national origin and religion.

¶ 35      Velpuru's religion is Hindu and his nationality is Indian and he testified that, in school, he learned of conflicts between Indian/Hindus and Pakistani/Muslims. Velpuru also testified that he performed for charity events. One event in particular, he sang in front of a screen which pictured the Indian flag, military personnel, and airplanes and read "All proceeds from today's event will

go to the honor of the brave hearts. We salute our heroes ***" and "We stand with the families of martyrs of the Pulwama attack." However, Velpuru testified that he could not remember if the event was intended to support India's military in its conflict with Pakistan.

¶ 36    Saleem argues that, in considering Velpuru's lies and self-serving testimony in totality, the court must infer that the reason behind those false and misleading statements was to hide his discriminatory animus towards Saleem. However, we disagree.

¶ 37    Even assuming that Velpuru lied about (1) knowing Saleem's religion and national origin, (2) remembering whether he performed at a charity event which raised money to support India's military in its conflict with Pakistan, Saleem's theory fails because it requires us to make a speculative conjecture as to Velpuru's state of mind. Although Velpuru's deposition testimony is evasive at times, the evidence is certainly not an admission of discriminatory animus and falls far short of a "convincing mosiac" pointing directly to Velpuru's discriminatory animus. Rather, Saleem provides evidence which would require this court to make multiple inferences or presumptions which is inappropriate to establish direct discrimination.

¶ 38    Here, Saleem asks the court to perform the same legal gymnastics as the plaintiff in *Johnson v. Koppers Inc.*, 726 F.3d 910 (7th Cir. 2013). In *Johnson*, the plaintiff attempted to hold her employer liable under the cat's paw theory by alleging that her co-worker made a false report in order to have her employment terminated. *Id.* at 915. The plaintiff claimed that the co-worker falsely reported that the plaintiff called him racial and gender-based slurs because the co-worker actually harbored those biases towards the plaintiff herself and that it was a "classic case of projection." *Id.* The Seventh Circuit refused to engage in that type of speculation stating, "we are not required to draw inferences that 'are supported by only speculation and conjecture.'" *Id.* at 915 (quoting *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013)). While Saleem alleges

more false and self-serving statements than the *Johnson* plaintiff, the inferences he asks us to draw are the same. Even construing the facts in his favor, we cannot conclude that Saleem has shown a genuine question of material fact that Velpuru's actions were motivated by racial animus under a theory of direct discrimination.

¶ 39                                B. Indirect Discrimination

¶ 40        Saleem also argues that the trial court erroneously determined that he failed to present evidence of discrimination under the indirect method. The Supreme Court of the United States outlined a three-part burden-shifting analysis for indirectly proving employment discrimination in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, first, a plaintiff must present enough evidence to establish a *prima facie* case that (1) he was a member of a protected class, (2) that he was meeting his employer's legitimate employment expectations, (3) he suffered an adverse employment action, and (4) he was treated less favorably than a similarly situated person who was not a member of the protected class. *Id.* at 802; *Spencer v. Illinois Human Rights Comm'n*, 2021 IL App (1st) 170026, ¶ 34; *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). When considering whether a plaintiff has met their burden the evidence must be considered as a whole. *Lau*, 2019 IL App (2d) 180456, ¶¶ 39, 44. The burden of establishing a *prima facie* case of disparate treatment is not onerous. *Id.* at ¶ 40.

¶ 41        If the plaintiff can do this, the burden of proof shifts to the employer to articulate a legitimate, nondiscriminatory business purpose for the action. *McDonnell Douglas*, 411 U.S. at 802; *Lau*, 2019 IL App (2d) 180456, ¶ 39. If the employer is able to articulate a legitimate business reason, the plaintiff is afforded the opportunity to prove that the reason offered by the employer was not its true reason but rather was a pretext for discrimination. *Id.* The determination of whether an employer's articulated reason is pretextual is a question of fact. *Spencer*, 2021 IL App (1st)

170026, ¶ 33. "In some cases, \*\*\* the issue of satisfactory performance and the question of pretext overlap. When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis." *Johnson*, 726 F.3d at 916.

¶ 42 Here, neither side disputes that Saleem is a member of a protected class nor that his termination was an adverse employment action. The issues then turn to whether Saleem has made a *prima facie* case that he was meeting GES's legitimate business expectations and whether he was treated less favorably than his comparators. If Saleem has presented a *prima facie* case, then we must determine whether he presented a genuine question of material fact that GES's articulated reason is actually a pretext for discrimination.

¶ 43 The trial court found that Saleem failed to present evidence to demonstrate that he was meeting GES' legitimate employment expectations. Saleem argues that this was an error because the trial court ignored evidence which refuted Velpuru's claims about his performance and drew improper inferences and made implicit credibility determinations in favor of the movant, GES. In response, GES argues that because Saleem admitted to performance deficiencies when he shut down one of the CORE production databases, no reasonable jury could find that he met legitimate employment expectations.

¶ 44 It is undisputed that Saleem was responsible for the shutdown of COREDB05. The trial court noted that this "incident would be decisive in [GES]'s decision to terminate Saleem." Saleem emailed Velpuru admitting that he shutdown COREDB05 by accident while trying to shutdown development. Then, in his January 31st email, Velpuru reported to Holland and Ringo that

"[d]uring the prime time of the day, [Saleem] has shutdown production instead of shutting down development."

¶ 45 However, the relevant inquiry here does not require Saleem's admission that production was shut down, rather, we look to whether GES's decisionmakers "genuinely believed" he shut down production. *Johnson*, 726 F.3d at 916. The evidence demonstrated that the individuals who decided to terminate Saleem may not have understood the scope of the "shutdown" and failed to verify the report when making their decision although they had information to suggest the report was not fully accurate.

¶ 46 In the January 31st email to Holland and Ringo reporting production was "shutdown," Velpuru attached copy of Saleem's email which stated that Saleem had shut down COREDB05. However, Holland testified that her understanding of the January 31st email was that Saleem had shut down the company's main operating system such that it was inaccessible and unusable both internally and externally. She testified that such a shutdown would cause massive destruction for long periods of time, but in reality, the shutdown COREDB05 lasted approximately twenty minutes. Holland stated that the CORE shutdown was the most concerning allegation Velpuru reported and that, at the time of Saleem's termination, she was unaware that he had not completely shut down CORE. Further, Holland testified that Saleem's termination was based on Velpuru's allegations, rather than Saleem's email stating that he only shut down one of the production servers. Holland testified "I obviously respect [Velpuru] and his knowledge and understanding of the business and our systems, and Mr. Saleem's performance." Additionally, Holland stated "[t]he managers know their business a lot better than we do and *** if somebody *** comes to us and give us kind of the facts of the details *** that it was severe enough from *** our perspective, from [Velpuru's] perspective, we agreed upon it." Saleem argues that Velpuru misrepresented the

incident as a complete shutdown of GES's production, which led decisionmakers to believe Saleem committed a significant error that had a greater impact on GES than what actually occurred. There is evidence that GES decisionmakers based Saleem's termination on this misrepresentation although they had information which suggested that the scope of the shutdown was different than what Velpuru reported. A genuine question of fact exists as to whether GES's decisionmakers "genuinely believed" Saleem shutdown production.

¶ 47    The trial court believed that Saleem's interpretation was a mischaracterization of Holland's testimony based upon leading deposition questions and a failure to clarify whether the shutdown was a single database shutdown or a comprehensive, system-wide shutdown. However, neither Saleem basing his evidence on leading deposition questions or failing to ask "clarifying" questions means that he mischaracterized the evidence. Contrary, Saleem presents a reasonable inference based on Holland's testimony. The court must view this evidence in a light most favorable to Saleem as the non-movant. In doing so, it is clear that he has presented a genuine issue of material fact as to whether the decisionmakers who terminated him misunderstood or impermissibly overlooked the nature of the shutdown.

¶ 48    Additionally, the trial court acknowledged that GES "produces little evidence of *** loss." Velpuru testified that he was not aware if GES lost any clients, if any data had been lost, or if GES suffered any financial loss as a result of the shutdown. Barua testified that he did not know if any users were unable to access CORE or if there was any financial loss as a result of the shutdown. Tyler Berthelson ("Berthelson"), a junior DBA, testified that "[s]hutting down the server at the wrong time [was] very common." Holland testified that the decisionmakers viewed the shutdown as "severe enough" to warrant termination but this was based upon her possible belief that it was a complete shutdown of production. While the "seriousness" is not a consideration under case law,

it is clear from Holland's testimony that the decisionmakers may have considered the seriousness or severity of the failure when determining whether Saleem was meeting business expectations. This evidence, when taken as a whole, raises credibility questions and genuine issues of material fact as to whether the decisionmaker's articulated reasons for terminating Saleem's employment was a pretext.

¶ 49 The trial court also reasoned that Saleem had not presented any evidence to refute Velpuru's reports of his other performance deficiencies. While the trial court noted that a possible "exception" to its conclusion that Saleem presented no evidence to refute Velpuru's reports was Saleem's denial of performance deficiencies, it ultimately dismissed the denials by reasoning that there was no evidence to substantiate them. However, the trial court failed to acknowledge evidence Saleem put forth to support his denial and weighed evidence of his failure to meet business expectations in favor of GES. Specifically, the trial court overlooked and improperly weighed evidence that Saleem (1) migrated code under other supervisors, (2) after receiving training from Velpuru on a specific migration, he was able to successfully perform the specific migration (3) emails showing that he assigned tasks to himself and completed them, and (4) testimony that every team member had issues with diagnosing system investigations and system errors such that it was a common issue that incorrectly doing so could not be a *legitimate* business expectation.

¶ 50 The January 19th email also listed a number of issues with Saleem' performance and stated that there had been problems with his work for the past 6 months. However, less than 6 months prior to the email, Saleem received a performance award for "delivering results with significant business impact that were *above and beyond required*." (emphasis added). Not only does the conflicting evidence raise a question of fact whether Saleem was meeting legitimate employment

expectations but it also raises a question as to the credibility of Velpuru's reports regarding Saleem's performance. The decisionmakers at GES had access to Saleem's performance reports, there is evidence to suggest that they were aware of the conflicts in the reports but ignored them, further raising questions of the credibility of GES decisionmakers.

¶ 51    There is no evidence that Barua, Holland, and Ringo independently verified Velpuru's claims about Saleem's performance. In fact, they all testified that they could not remember independently verifying the claims. While Velpuru's reports are valuable pieces of evidence, Saleem has presented enough evidence to show a genuine question of fact whether the reports are accurate as to his performance and whether the decisionmakers were aware of the conflicting reports but overlooked them and failed to verify them.

¶ 52    In this case, the trial court impermissibly disregarded evidence and weighed the evidence and made credibility determinations in favor of the movant, GES. These are issues which should ultimately be left for the trier of fact. Therefore, we find that Saleem presented enough evidence to raise a genuine question of fact that he was meeting GES's legitimate business expectations and that GES's articulated reasons for termination were a mere pretext.

¶ 53    Indirect discrimination also requires a plaintiff to show that he was treated less favorably than a similarly situated person who was not a member of the protected class. The trial court found that Saleem did not have any appropriate comparators based upon the fact that no other employee had Saleem's job title and no other employee mistakenly shutdown a production database. Saleem argues that the trial court erred in this finding because comparators do not need to be identical and other employees made performance mistakes but were not subject to discipline.

¶ 54    First, we note that comparators "need not be identical in every conceivable way," rather they should be "comparators, not clones." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012);

see *Lau*, 2019 IL App (2d) 180456, ¶ 46 (the analysis calls for a "'flexible, common-sense' examination of all relevant factors" (internal citations omitted)). Courts look at whether employees (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Lau*, 2019 IL App (2d) 180456, ¶ 46. "Whether a comparator is similarly situated is 'usually a question for the fact finder" and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." Id.

¶ 55    Here, the trial court summarily disregarded Saleem's comparators. Specifically, Berthelson, a white male, was a junior DBA who also reported to Velpuru and had substantially similar IT duties. Although Saleem was a senior DBA, the trial court's conclusion that their different job titles meant that Berthelson is not a comparator is misplaced. During his employment, Berthelson deleted data which resulted in allegedly months of loss. In his testimony, Velpuru claimed that, although Saleem attempted to assist Berthelson during the issue, he "did not blame" Saleem for Berthelson's mistakes. Berthelson was never disciplined for this. Nonetheless, Velpuru listed this as a reason he was requesting Saleem's termination. Velpuru attached communications stating that Berthelson and Saleem were working on this issue together. GES's decisionmakers had information which suggested that the data loss was not Saleem's fault, but failed to further investigate the issue and did not discipline anyone else for the matter. Such a decision raises questions of fact as to who was believed to be at fault for the data loss and questions of credibility whether GES's reasons for terminating Saleem's employment were a pretext.

¶ 56                                III. CONCLUSION

¶ 57        For the reasons stated, we affirm the judgment of the trial court finding that plaintiff

cannot state a claim unlawful discrimination under the cat's paw theory of liability. However, we

reverse and remand the trial court's decision granting the defendant's motion for summary

judgment and dismissing the plaintiff's claims under indirect discrimination.

¶ 58        Affirmed in part, reversed and remanded in part.